(Slip Opinion)       OCTOBER  TERM,  2005                    1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. *v.* DABIT

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 04–1371.   Argued January 18, 2006—Decided March 21, 2006

Respondent Dabit filed a private securities fraud class action in federal court, invoking diversity jurisdiction to advance his state-law claims that petitioner, his former employer, fraudulently manipulated stock prices, causing him and other brokers and their clients to keep their overvalued securities.  The District Court dismissed his amended complaint, finding his claims pre-empted by title I of the Securities Litigation Uniform Standards Act of 1998 (SLUSA), which provides that no "covered class action" based on state law and alleging "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security" "may be maintained in any State or Federal court by any private party." 15 U. S. C. §78bb(f)(1)(A).  Vacating the judgment, the Second Circuit concluded that, to the extent the complaint alleged that brokers were fraudulently induced, not to sell or purchase, but to retain or delay selling, it fell outside SLUSA's pre-emptive scope.

*Held:* The background, text, and purpose of SLUSA's pre-emption provision demonstrate that SLUSA pre-empts state-law holder class-action claims of the kind Dabit alleges.  Pp. 5–17.

   (a) The magnitude of the federal interest in protecting the integrity and efficiency of the national securities market cannot be overstated. The Securities Act of 1933 and the Securities Exchange Act of 1934 (1934 Act) anchor federal regulation of vital elements of this Nation's economy.  Securities and Exchange Commission (SEC) Rule 10b–5, which was promulgated pursuant to §10(b) of the 1934 Act, is an important part of that regulatory scheme, and, like §10(b), prohibits deception, misrepresentation, and fraud "in connection with the purchase or sale" of a security.  When, in *Blue Chip Stamps* v. *Manor*

*Drug Stores,* 421 U. S. 723, this Court limited the Rule 10b–5 private right of action to plaintiffs who were themselves purchasers or sellers, it relied on the widespread recognition that suits by nonpurchasers and nonsellers present a special risk of vexatious litigation that could "frustrate or delay normal business activity," *id.,* at 740. Pp. 5–8.

(b) Similar policy considerations prompted Congress to adopt legislation (Reform Act) targeted at perceived abuses of class actions— *e.g.,* nuisance filings and vexatious discovery requests—but this effort prompted members of the plaintiffs' bar to avoid the federal forum altogether. To stem the shift of class actions from federal to state courts, Congress enacted SLUSA. Pp. 8–10.

(c) Both the class and the securities here are "covered" within SLUSA's meaning, and the complaint alleges misrepresentations and omissions of material facts. The only disputed issue is whether the alleged wrongdoing was "in connection with the purchase or sale" of securities. Dabit's narrow reading would pre-empt only those actions in which *Blue Chip Stamps'* purchaser-seller requirement is met. Insofar as that argument assumes that the *Blue Chip Stamps* rule stems from Rule 10b–5's text, it must be rejected, for the Court relied on "policy considerations" in adopting that limitation, and it purported to define the scope of a private right of action under Rule 10b–5, not to define "in connection with the purchase or sale." When this Court has sought to give meaning to that phrase in the §10(b) and Rule 10b–5 context, it has broadly required that the alleged fraud "coincide" with a securities transaction, an interpretation that comports with the SEC's longstanding views. Congress can hardly have been unaware of this broad construction when it imported the phrase into SLUSA. Where judicial interpretations have settled a statutory provision's meaning, repeating the same language in a new statute indicates the intent to incorporate the judicial interpretations as well. That presumption is particularly apt here, because Congress not only used §10(b)'s and Rule 10b–5's words, but used them in another provision appearing in the same statute as §10(b). The presumption that Congress envisioned a broad construction also follows from the particular concerns that culminated in SLUSA's enactment, viz., preventing state private securities class-action suits from frustrating the Reform Act's objectives. A narrow construction also would give rise to wasteful, duplicative litigation in state and federal courts. The presumption that "Congress does not cavalierly pre-empt state-law causes of action," *Medtronic, Inc.* v. *Lohr,* 518 U. S. 470, 485, has less force here because SLUSA does not pre-empt any cause of action. It simply denies the use of the class-action device to vindicate certain claims. Moreover, tailored exceptions to SLUSA's pre-

Syllabus

emptive command—for, *e.g.*, state agency enforcement proceedings—demonstrate that Congress did not act cavalierly. Finally, federal, not state, law has long been the principal vehicle for asserting class-action securities fraud claims. Pp. 10–16.

(d) Dabit's holder class action is distinguishable from a typical Rule 10b–5 class action only in that it is brought by holders rather than sellers or purchasers. That distinction is irrelevant for SLUSA preemption purposes. The plaintiffs' identity does not determine whether the complaint alleges the requisite fraud, and the alleged misconduct here—fraudulent manipulation of stock prices—unquestionably qualifies as a fraud "in connection with the purchase or sale" of securities as the phrase is defined in *SEC* v. *Zandford,* 535 U. S. 813, 820, and *United States* v. *O'Hagan,* 521 U. S. 642, 651. Pp. 16–17.

395 F. 3d 25, vacated and remanded.

STEVENS, J., delivered the opinion of the Court, in which all other Members joined, except ALITO, J., who took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 04–1371

———————

## MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., PETITIONER *v.* SHADI DABIT

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[March 21, 2006]

JUSTICE STEVENS delivered the opinion of the Court.

Title I of the Securities Litigation Uniform Standards Act of 1998 (SLUSA) provides that "[n]o covered class action" based on state law and alleging "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security" "may be maintained in any State or Federal court by any private party." §101(b), 112 Stat. 3227 (codified at 15 U. S. C. § 78bb(f)(1)(A)). In this case the Second Circuit held that SLUSA only pre-empts state-law class-action claims brought by plaintiffs who have a private remedy under federal law. 395 F. 3d 25 (2005). A few months later, the Seventh Circuit ruled to the contrary, holding that the statute also pre-empts state-law class-action claims for which federal law provides no private remedy. *Kircher* v. *Putnam Funds Trust*, 403 F. 3d 478 (2005). The background, the text, and the purpose of SLUSA's pre-emption provision all support the broader interpretation adopted by the Seventh Circuit.

I

Petitioner Merrill Lynch, Pierce, Fenner & Smith, Inc.

(Merrill Lynch), is an investment banking firm that offers research and brokerage services to investors. Suspicious that the firm's loyalties to its investment banking clients had produced biased investment advice, the New York attorney general in 2002 instituted a formal investigation into Merrill Lynch's practices. The investigation sparked a number of private securities fraud actions, this one among them.[1]

Respondent, Shadi Dabit, is a former Merrill Lynch broker. He filed this class action in the United States District Court for the Western District of Oklahoma on behalf of himself and all other former or current brokers who, while employed by Merrill Lynch, purchased (for themselves and for their clients) certain stocks between December 1, 1999, and December 31, 2000. See App. 27a–46a. Rather than rely on the federal securities laws, Dabit invoked the District Court's diversity jurisdiction and advanced his claims under Oklahoma state law.

The gist of Dabit's complaint was that Merrill Lynch breached the fiduciary duty and covenant of good faith and fair dealing it owed its brokers by disseminating misleading research and thereby manipulating stock prices.[2] Dabit's theory was that Merrill Lynch used its misinformed brokers to enhance the prices of its investment banking clients' stocks: The research analysts, under management's direction, allegedly issued overly optimistic appraisals of the stocks' value; the brokers allegedly relied on the analysts' reports in advising their investor clients

_____

[1] Merrill Lynch eventually settled its dispute with the New York attorney general.

[2] The complaint alleged, for example, that the prices of the subject stocks were "artificially inflated as a result of the manipulative efforts" of Merrill Lynch, and that Merrill Lynch, "acting as a central nerve center in the manipulation of various stocks . . . , perpetrated this stock manipulation through a variety of deceptive devices, artifices, and tactics that are the hallmarks of stock manipulation." App. 28a–29a.

and in deciding whether or not to sell their own holdings; and the clients and brokers both continued to hold their stocks long beyond the point when, had the truth been known, they would have sold. The complaint further alleged that when the truth was actually revealed (around the time the New York attorney general instituted his investigation), the stocks' prices plummeted.

Dabit asserted that Merrill Lynch's actions damaged the class members in two ways: The misrepresentations and manipulative tactics caused them to hold onto overvalued securities, and the brokers lost commission fees when their clients, now aware that they had made poor investments, took their business elsewhere.

In July 2002, Merrill Lynch moved to dismiss Dabit's complaint. It argued, first, that SLUSA pre-empted the action and, second, that the claims alleged were not cognizable under Oklahoma law. The District Court indicated that it was "not impressed by" the state-law argument, but agreed that the federal statute pre-empted at least some of Dabit's claims. *Id.*, at 49a–50a. The court noted that the complaint alleged both "claims and damages based on wrongfully-induced purchases" and "claims and damages based on wrongfully-induced holding." *Ibid.* While the "holding" claims, the court suggested, might not be pre-empted, the "purchasing" claims certainly were. The court dismissed the complaint with leave to amend to give Dabit the opportunity to untangle his "hopeless mélange of purchase-related and holding-related assertions." *Ibid.* (punctuation added).

Dabit promptly filed an amended complaint that omitted all direct references to purchases. What began as a class of brokers who "purchased" the subject securities during the class period became a class of brokers who "owned and continued to own" those securities. See *id.*, at 52a.

Meanwhile, dozens of other suits, based on allegations

similar to Dabit's, had been filed against Merrill Lynch
around the country on both federal- and state-law theories
of liability. The Judicial Panel on Multidistrict Litigation
transferred all of those cases, along with this one, to the
United States District Court for the Southern District of
New York for consolidated pretrial proceedings. Merrill
Lynch then filed its second motion to dismiss Dabit's
complaint. Senior Judge Milton Pollack granted the mo-
tion on the ground that the claims alleged fell "squarely
within SLUSA's ambit." *In re Merrill Lynch & Co., Inc.*,
2003 WL 1872820, *1 (Apr. 10, 2003).

The Court of Appeals for the Second Circuit, however,
vacated the judgment and remanded for further proceed-
ings. 395 F. 3d, at 51. It concluded that the claims as-
serted by holders did not allege fraud "in connection with
the purchase or sale" of securities under SLUSA. Al-
though the court agreed with Merrill Lynch that that
phrase, as used in other federal securities laws, has been
defined broadly by this Court, it held that Congress none-
theless intended a narrower meaning here—one that
incorporates the "standing" limitation on private federal
securities actions adopted in *Blue Chip Stamps* v. *Manor
Drug Stores,* 421 U. S. 723 (1975). Under the Second Cir-
cuit's analysis, fraud is only "in connection with the pur-
chase or sale" of securities, as used in SLUSA, if it is alleged
by a purchaser or seller of securities. Thus, to the extent
that the complaint in this action alleged that brokers were
fraudulently induced, not to sell or purchase, but to retain
or delay selling their securities, it fell outside SLUSA's pre-
emptive scope.[3]

After determining that the class defined in Dabit's

———————

[3] The Court of Appeals also concluded that Dabit's lost commission
claims escaped pre-emption under SLUSA because they did not "allege
fraud that 'coincide[s]' with the sale or purchase of a security." 395
F. 3d, at 47 (quoting *SEC* v. *Zandford,* 535 U. S. 813, 825 (2002)). That
determination is not before this Court for review.

amended complaint did not necessarily exclude purchasers, the panel remanded with instructions that the pleading be dismissed without prejudice. The court's order would permit Dabit to file another amended complaint that defines the class to exclude "claimants who purchased in connection with the fraud and who therefore could meet the standing requirement" for a federal damages action, and to include only those "who came to hold [a Merrill Lynch] stock before any relevant misrepresentation." 395 F. 3d, at 45–46. Under the Second Circuit's analysis, a class action so limited could be sustained under state law. For the reasons that follow, we disagree.

## II

The magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated. In response to the sudden and disastrous collapse in prices of listed stocks in 1929, and the Great Depression that followed, Congress enacted the Securities Act of 1933 (1933 Act), 48 Stat. 74, and the Securities Exchange Act of 1934 (1934 Act), 48 Stat. 881. Since their enactment, these two statutes have anchored federal regulation of vital elements of our economy.

Securities and Exchange Commission (SEC) Rule 10b–5, 17 CFR §240.10b–5 (2005), promulgated in 1942 pursuant to §10(b) of the 1934 Act, 15 U. S. C. §78j(b), is an important part of that regulatory scheme. The Rule, like §10(b) itself,[4] broadly prohibits deception, misrepresentation, and

---

[4] Section 10(b) provides as follows:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in

fraud "in connection with the purchase or sale of any security."[5]   The SEC has express statutory authority to enforce the Rule.  See 15 U. S. C. §78u (2000 ed. and Supp. III).  Although no such authority is expressly granted to private individuals injured by securities fraud, in 1946 Judge Kirkpatrick of the United States District Court for the Eastern District of Pennsylvania, relying on "the general purpose" of the Rule, recognized an implied right of action thereunder.  *Kardon* v. *National Gypsum Co.*, 69 F. Supp. 512, 514.  His holding was adopted by an "overwhelming consensus of the District Courts and Courts of Appeals," *Blue Chip Stamps*, 421 U. S., at 730, and endorsed by this Court in *Superintendent of Ins. of N. Y.* v. *Bankers Life & Casualty Co.,* 404 U. S. 6 (1971).

A few years after *Kardon* was decided, the Court of Appeals for the Second Circuit limited the reach of the private right of action under Rule 10b–5.  In *Birnbaum* v. *Newport Steel Corp.*, 193 F. 2d 461 (1952), a panel composed of Chief Judge Swan and Judges Augustus and Learned Hand upheld the dismissal of a suit brought on behalf of a corporation and a class of its stockholders

_____

contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U. S. C. §78j(b).

[5] The text of the Rule is as follows:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

"in connection with the purchase or sale of any security."  17 CFR §240.10b–5 (2005).

alleging that fraud "in connection with" a director's sale of his controlling block of stock to third parties violated Rule 10b–5. The court held that the Rule could only be invoked by a purchaser or seller of securities to remedy fraud associated with his or her own sale or purchase of securities, and did not protect those who neither purchased nor sold the securities in question but were instead injured by corporate insiders' sales to third parties. *Id.*, at 464. While the *Birnbaum* court did not question the plaintiffs' "standing" to enforce Rule 10b–5, later cases treated its holding as a standing requirement. See *Eason* v. *General Motors Acceptance Corp.*, 490 F. 2d 654, 657 (CA7 1973).

By the time this Court first confronted the question, literally hundreds of lower court decisions had accepted "*Birnbaum*'s conclusion that the plaintiff class for purposes of §10(b) and Rule 10b–5 private damages actions is limited to purchasers and sellers." *Blue Chip Stamps*, 421 U. S., at 731–732. Meanwhile, however, cases like *Bankers Life & Casualty Co.* had interpreted the coverage of the Rule more broadly to prohibit, for example, "deceptive practices *touching* [a victim's] sale of securities as an investor." 404 U. S., at 12–13 (emphasis added); see *Eason*, 490 F. 2d, at 657 (collecting cases). The "judicial oak which ha[d] grown from little more than a legislative acorn," as then-Justice Rehnquist described the rules governing private Rule 10b–5 actions, *Blue Chip Stamps*, 421 U. S., at 737, had thus developed differently from the law defining what constituted a substantive violation of Rule 10b–5. Ultimately, the Court had to decide whether to permit private parties to sue for any violation of Rule 10b–5 that caused them harm, or instead to limit the private remedy to plaintiffs who were themselves purchasers or sellers.

Relying principally on "policy considerations" which the Court viewed as appropriate in explicating a judicially crafted remedy, *ibid.*, and following judicial precedent

rather than "the many commentators" who had criticized the *Birnbaum* rule as "an arbitrary restriction which unreasonably prevents some deserving plaintiffs from recovering damages," 421 U. S., at 738, the Court in *Blue Chip Stamps* chose to limit the private remedy. The main policy consideration tipping the scales in favor of precedent was the widespread recognition that "litigation under Rule 10b–5 presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general." *Id.*, at 739. Even weak cases brought under the Rule may have substantial settlement value, the Court explained, because "[t]he very pendency of the lawsuit may frustrate or delay normal business activity." *Id.*, at 740. Cabining the private cause of action by means of the purchaser-seller limitation would, in the Court's view, minimize these ill effects. The limitation of course had no application in Government enforcement actions brought pursuant to Rule 10b–5. See *id.*, at 751, n. 14.

## III

Policy considerations similar to those that supported the Court's decision in *Blue Chip Stamps* prompted Congress, in 1995, to adopt legislation targeted at perceived abuses of the class-action vehicle in litigation involving nationally traded securities. While acknowledging that private securities litigation was "an indispensable tool with which defrauded investors can recover their losses," the House Conference Report accompanying what would later be enacted as the Private Securities Litigation Reform Act of 1995 (Reform Act), 109 Stat. 737 (codified at 15 U. S. C. §§77z–1 and 78u–4), identified ways in which the class action device was being used to injure "the entire U. S. economy." H. R. Rep. No. 104–369, p. 31 (1995). According to the Report, nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and "manipulation by class action lawyers of the clients whom

they purportedly represent" had become rampant in recent years. *Ibid.* Proponents of the Reform Act argued that these abuses resulted in extortionate settlements, chilled any discussion of issuers' future prospects, and deterred qualified individuals from serving on boards of directors. *Id.*, at 31–32.

Title I of the Reform Act, captioned "Reduction of Abusive Litigation," represents Congress' effort to curb these perceived abuses. Its provisions limit recoverable damages and attorney's fees, provide a "safe harbor" for forward-looking statements, impose new restrictions on the selection of (and compensation awarded to) lead plaintiffs, mandate imposition of sanctions for frivolous litigation, and authorize a stay of discovery pending resolution of any motion to dismiss. See 15 U. S. C. §78u–4. Title I also imposes heightened pleading requirements in actions brought pursuant to §10(b) and Rule 10b–5; it "insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U. S. 336, 345 (2005) (quoting 15 U. S. C. §§78u–4(b)(1), (2)).

The effort to deter or at least quickly dispose of those suits whose nuisance value outweighs their merits placed special burdens on plaintiffs seeking to bring federal securities fraud class actions. But the effort also had an unintended consequence: It prompted at least some members of the plaintiffs' bar to avoid the federal forum altogether. Rather than face the obstacles set in their path by the Reform Act, plaintiffs and their representatives began bringing class actions under state law, often in state court. The evidence presented to Congress during a 1997 hearing to evaluate the effects of the Reform Act suggested that this phenomenon was a novel one; state-court litigation of

class actions involving nationally traded securities had previously been rare. See H. R. Rep. No. 105–640, p. 10 (1998); S. Rep. No. 105–182, pp. 3–4 (1998). To stem this "shif[t] from Federal to State courts" and "prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of" the Reform Act, SLUSA §§2(2), (5), 112 Stat. 3227, Congress enacted SLUSA.

## IV

The core provision of SLUSA reads as follows:[6]

> "CLASS ACTION LIMITATIONS.—No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging—
>
> "(A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
>
> "(B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security." *Id.*, at 3230 (codified as amended at 15 U. S. C. §78bb(f)(1)).[7]

A "covered class action" is a lawsuit in which damages are sought on behalf of more than 50 people.[8] A "covered

---

[6] SLUSA amends the 1933 Act and the 1934 Act in substantially identical ways. For convenience and because they are more pertinent here, we quote the amendments to the 1934 Act.

[7] Another key provision of the statute makes all "covered class actions" filed in state court removable to federal court. 112 Stat. 3230 (codified at 15 U. S. C. §78bb(f)(2)).

[8] "The term 'covered class action' means—

"(i) any single lawsuit in which—

"(I) damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission,

security" is one traded nationally and listed on a regulated national exchange.[9]   Respondent does not dispute that both the class and the securities at issue in this case are "covered" within the meaning of the statute, or that the complaint alleges misrepresentations and omissions of material facts.   The only disputed issue is whether the alleged wrongdoing was "in connection with the purchase or sale" of securities.

Respondent urges that the operative language must be read narrowly to encompass (and therefore pre-empt) only those actions in which the purchaser-seller requirement of *Blue Chip Stamps* is met.   Such, too, was the Second Circuit's view.   But insofar as the argument assumes that the rule adopted in *Blue Chip Stamps* stems from the text of Rule 10b–5—specifically, the "in connection with" language, it must be rejected.   Unlike the *Birnbaum* court, which relied on Rule 10b–5's text in crafting its purchaser-seller limitation, this Court in *Blue Chip Stamps* relied

—————

predominate over any questions affecting only individual persons or members; or

"(II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members; or

"(ii) any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which—

"(I) damages are sought on behalf of more than 50 persons; and

"(II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose." 112 Stat. 3232 (codified at 15 U. S. C. §78bb(f)(5)(B)).

[9] "The term 'covered security' means a security that satisfies the standards for a covered security specified in paragraph (1) or (2) of section 18(b) of the Securities Act of 1933, at the time during which it is alleged that the misrepresentation, omission, or manipulative or deceptive conduct occurred. . . ."   112 Stat. 3232 (codified at 15 U. S. C. §78bb(f)(5)(E)).   Section 18(b) of the 1933 Act in turn defines "covered security" to include securities traded on a national exchange. §77r(b).

chiefly, and candidly, on "policy considerations" in adopting that limitation. 421 U. S., at 737. The *Blue Chip Stamps* Court purported to define the scope of a private right of action under Rule 10b–5—not to define the words "in connection with the purchase or sale." *Id.*, at 749 ("No language in either [§10(b) or Rule 10b–5] speaks at all to the contours of a private cause of action for their violation"). Any ambiguity on that score had long been resolved by the time Congress enacted SLUSA. See *United States* v. *O'Hagan*, 521 U. S. 642, 656, 664 (1997); *Holmes* v. *Securities Investor Protection Corporation*, 503 U. S. 258, 285 (1992) (O'Connor, J., concurring in part and concurring in judgment); *id.*, at 289–290 (SCALIA, J., concurring in judgment); *United States* v. *Naftalin*, 441 U. S. 768, 774, n. 6 (1979); see also 395 F. 3d, at 39 (acknowledging that "[t]he limitation on standing to bring [a] private suit for damages for fraud in connection with the purchase or sale of securities is unquestionably a distinct concept from the general statutory and regulatory prohibition on fraud in connection with the purchase or sale of securities").

Moreover, when this Court *has* sought to give meaning to the phrase in the context of §10(b) and Rule 10b–5, it has espoused a broad interpretation. A narrow construction would not, as a matter of first impression, have been unreasonable; one might have concluded that an alleged fraud is "in connection with" a purchase or sale of securities only when the plaintiff himself was defrauded into purchasing or selling particular securities. After all, that was the interpretation adopted by the panel in the *Birnbaum* case. See 193 F. 2d, at 464. But this Court, in early cases like *Superintendent of Ins. of N. Y.* v. *Bankers Life & Casualty Co.,* 404 U. S. 6 (1971), and most recently in *SEC* v. *Zandford*, 535 U. S. 813, 820, 822 (2002), has rejected that view. Under our precedents, it is enough that the fraud alleged "coincide" with a securities transaction—

whether by the plaintiff or by someone else. See *O'Hagan*, 521 U. S., at 651. The requisite showing, in other words, is "deception 'in connection with the purchase or sale of any security,' not deception of an identifiable purchaser or seller." *Id.*, at 658. Notably, this broader interpretation of the statutory language comports with the longstanding views of the SEC. See *Zandford*, 535 U. S., at 819–820.[10]

Congress can hardly have been unaware of the broad construction adopted by both this Court and the SEC when it imported the key phrase—"in connection with the purchase or sale"—into SLUSA's core provision. And when "judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its . . . judicial interpretations as well." *Bragdon* v. *Abbott*, 524 U. S. 624, 645 (1998); see *Cannon* v. *University of Chicago*, 441 U. S. 677, 696–699 (1979). Application of that presumption is particularly apt here; not only did Congress use the same words as are used in §10(b) and Rule 10b–5, but it used them in a provision that appears in the same statute as §10(b). Generally, "identical words used in different parts of the same statute are . . . presumed to have the same meaning." *IBP, Inc.* v. *Alvarez*, 546 U. S. \_\_, \_\_ (2005) (slip op., at 11).

The presumption that Congress envisioned a broad construction follows not only from ordinary principles of statutory construction but also from the particular concerns that culminated in SLUSA's enactment. A narrow reading of the statute would undercut the effectiveness of the 1995 Reform Act and thus run contrary to SLUSA's

---

[10] In *Zandford*, we observed that the SEC has consistently "maintained that a broker who accepts payment for securities that he never intends to deliver, or who sells customer securities with intent to misappropriate the proceeds, violates §10(b) and Rule 10b–5." 535 U. S., at 819. Here, too, the SEC supports a broad reading of the "in connection with" language.

stated purpose, viz., "to prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives" of the 1995 Act. SLUSA §2(5), 112 Stat. 3227. As the *Blue Chip Stamps* Court observed, class actions brought by holders pose a special risk of vexatious litigation. 421 U. S., at 739. It would be odd, to say the least, if SLUSA exempted that particularly troublesome subset of class actions from its pre-emptive sweep. See *Kircher*, 403 F. 3d, at 484.

Respondent's preferred construction also would give rise to wasteful, duplicative litigation. Facts supporting an action by purchasers under Rule 10b–5 (which must proceed in federal court if at all) typically support an action by holders as well, at least in those States that recognize holder claims. The prospect is raised, then, of parallel class actions proceeding in state and federal court, with different standards governing claims asserted on identical facts. That prospect, which exists to some extent in this very case,[11] squarely conflicts with the congressional preference for "national standards for securities class action lawsuits involving nationally traded securities." SLUSA §2(5), 112 Stat. 3227.[12]

In concluding that SLUSA pre-empts state-law holder class-action claims of the kind alleged in Dabit's complaint, we do not lose sight of the general "presum[ption] that Congress does not cavalierly pre-empt state-law causes of action." *Medtronic, Inc.* v. *Lohr*, 518 U. S. 470,

---

[11] See 2003 WL 1872820, *1 (SDNY, Apr. 10, 2003) (observing that Dabit's holder claims rested "on the very same alleged series of transactions and occurrences asserted in the federal securities actions" filed against Merrill Lynch).

[12] See H. R. Rep. No. 105–640, p. 10 (1998) (the "solution" to circumvention of the Reform Act "is to make Federal court the exclusive venue for securities fraud class action litigation"); S. Rep. No. 105–182, p. 3 (1998) (identifying "the danger of maintaining differing federal and state standards of liability for nationally-traded securities").

485 (1996). But that presumption carries less force here than in other contexts because SLUSA does not actually pre-empt any state cause of action. It simply denies plaintiffs the right to use the class action device to vindicate certain claims. The Act does not deny any individual plaintiff, or indeed any group of fewer than 50 plaintiffs, the right to enforce any state-law cause of action that may exist.

Moreover, the tailored exceptions to SLUSA's pre-emptive command demonstrate that Congress did not by any means act "cavalierly" here. The statute carefully exempts from its operation certain class actions based on the law of the State in which the issuer of the covered security is incorporated, actions brought by a state agency or state pension plan, actions under contracts between issuers and indenture trustees, and derivative actions brought by shareholders on behalf of a corporation. 15 U. S. C. §§78bb(f)(3)(A)–(C), (f)(5)(C). The statute also expressly preserves state jurisdiction over state agency enforcement proceedings. §78bb(f)(4). The existence of these carve-outs both evinces congressional sensitivity to state prerogatives in this field and makes it inappropriate for courts to create additional, implied exceptions.

Finally, federal law, not state law, has long been the principal vehicle for asserting class-action securities fraud claims. See, *e.g.*, H. R. Conf. Rep. No. 105–803, p. 14 (1998) ("Prior to the passage of the Reform Act, there was essentially no significant securities class action litigation brought in State court").[13] More importantly, while state-

––––––––––

[13] Respondent points out that the Court in *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723 (1975), identified as a factor mitigating any unfairness caused by adoption of the purchaser-seller requirement that "remedies are available to nonpurchasers and nonsellers under state law." *Id.*, at 738, n. 9. He argues that this supports a narrow construction of SLUSA's pre-emption provision. But we do not here revisit the *Blue Chip Stamps* Court's understanding of the equities

law holder claims were theoretically available both before and after the decision in *Blue Chip Stamps*, the actual assertion of such claims by way of class action was virtually unheard of before SLUSA was enacted; respondent and his *amici* have identified only *one* pre-SLUSA case involving a state-law class action asserting holder claims.[14] This is hardly a situation, then, in which a federal statute has eliminated a historically entrenched state-law remedy. Cf. *Bates* v. *Dow Agrosciences LLC*, 544 U. S. 431, 449 (2005) (observing that a "long history" of state-law tort remedy "add[ed] force" to the presumption against pre-emption).

V

The holder class action that respondent tried to plead, and that the Second Circuit envisioned, is distinguishable from a typical Rule 10b–5 class action in only one respect: It is brought by holders instead of purchasers or sellers. For purposes of SLUSA pre-emption, that distinction is irrelevant; the identity of the plaintiffs does not determine whether the complaint alleges fraud "in connection with the purchase or sale" of securities. The misconduct of which respondent complains here—fraudulent manipulation of stock prices—unquestionably qualifies as fraud "in connection with the purchase or sale" of securities as the phrase is defined in *Zandford*, 535 U. S., at 820, 822, and *O'Hagan*, 521 U. S., at 651.

The judgment of the Court of Appeals for the Second Circuit is vacated, and the case is remanded for further

_____

involved in limiting the availability of private remedies under federal law; we are concerned instead with Congress' intent in adopting a pre-emption provision, the evident purpose of which is to limit the availability of remedies under state law.

[14] See Brief for Respondent 5 (citing *Weinberger* v. *Kendrick*, 698 F. 2d 61, 78 (CA2 1982) (approving a settlement that included holder claims brought pursuant to New York law)); see also Tr. of Oral Arg. 34–35.

Opinion of the Court

proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE ALITO took no part in the consideration or decision of this case.