Justice THOMAS, concurring.
I join the opinion of the Court on the understanding that the "misrepresentation[s] ... of ... material fact" alleged in this case are not properly considered "in connection with" transactions in covered securities. 15 U.S.C. § 78bb(f)(1)(A). We have said that the statutory phrase "in connection *398 with" warrants a "broad interpretation," Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 85, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006), though not so broad as to reach any "common-law fraud that happens to involve securities," see SEC v. Zandford, 535 U.S. 813, 820, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002). Considered in isolation, however, that phrase "is essentially 'indeterminat[e]' because connections, like relations, 'stop nowhere.' " Maracich v. Spears, 570 U.S. ----, ----, 133 S.Ct. 2191, 2200, 186 L.Ed.2d 275 (2013) (some internal quotation marks omitted). The phrase thus "provides little guidance without a limiting principle consistent with the structure of the statute and its other provisions." Ibid. As I understand it, the opinion of the Court resolves this case by applying a limiting principle to the phrase "in connection with" that is "consistent with the statutory framework and design" of the Securities Litigation Uniform Standards Act of 1998, id., at ----, 133 S.Ct., at 2200, and also consistent with our precedents.
Justice KENNEDY, with whom Justice ALITO joins, dissenting.
A number of investors purchased certificates of deposit (CDs) in the Stanford International Bank (SIB). For purposes of this litigation all accept the premise that Allen Stanford and SIB induced the investors to purchase the CDs by fraudulent representations. In various state and federal courts the investors filed state-law suits against persons and entities, including attorneys, accountants, brokers, and investment advisers, alleging that they participated in or enabled the fraud. The defendants in the state-court suits removed the actions to federal court, where they were consolidated with the federal-court suits. The defendants contended that the state-law suits are precluded under the terms of the Securities Litigation Uniform Standards Act of 1998 (SLUSA or Act), 15 U.S.C. § 78bb(f)(1). As the investors prevailed in the Court of Appeals, they are the respondents here. The persons and entities who were defendants in the state-law actions are the petitioners. The investors *399 contend the state-law suits are not precluded by SLUSA, and the petitioners contend the suits are precluded.
For purposes of determining SLUSA's reach, all can agree that the CD purchases would not have been, without more, transactions *1073 regulated by that Act; for the CDs were not themselves covered securities. As a result, in determining whether the Act must be invoked, a further circumstance must be considered: The investors purchased the CDs based on the misrepresentations that the CDs were, or would be, backed by investments in, among other assets, covered securities.
What must be resolved, to determine whether the Act precludes the state-law suits at issue, is whether the misrepresentations regarding covered securities and the ensuing failure to invest in those securities were so related to the purchase of the CDs that the misrepresentations were "misrepresentation[s] or omission[s] of a material fact in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1)(A).
The opinion for the Court, it seems fair to say, adopts this beginning framework, and it is quite correct to do so. The Court is further correct to view this litigation as involving a fraud of a type, scale, and perhaps sophistication that has not yet been addressed in its precedents with respect to the applicability of the federal securities laws.
It is the premise of this dissent that the more simple frauds addressed in this Court's precedents, where the Court did find fraud "in connection with the purchase or sale," are applicable here. In those cases, as here, the immediate cause of loss to the victim of the fraud was not simply a purchase or sale but rather a fraud that depended on the purchase or sale of securities or the promise to do so. It is submitted that this litigation should not come out differently simply because the fraud here was so widespread that many investors were misled by misrepresentations respecting investments, or promised investments, in regulated securities *400 in the markets. And it is necessary to caution that, in holding otherwise, the Court adopts a new approach, an approach which departs from the rules established in the earlier, albeit simpler, cases. And, as a consequence, today's decision, to a serious degree, narrows and constricts essential protection for our national securities markets, protection vital for their strength and integrity. The result will be a lessened confidence in the market, a force for instability that should otherwise be countered by the proper interpretation of federal securities laws and regulations. Though the reasons supporting the Court's opinion are set forth with care and clarity, this respectful dissent submits that established principles do not support its holding.
I
It must be determined whether the misrepresentations to the investors-misrepresentations that led them to buy CDs in the belief they could rely on the expertise and sophistication of Stanford and SIB in the national securities markets-were "misrepresentation[s] or omission[s] of ... material fact[s] in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1). This is the central provision of SLUSA for purposes of this litigation. The Court's precedents instruct that this language has broad application and must be construed flexibly in order to encompass new and ever more ingenious fraudulent schemes. Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 85, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006) ; SEC v. Zandford, 535 U.S. 813, 819, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002). The Court has held that a material misrepresentation is made "in connection with the purchase or sale" of a security when the "fraud coincided with the sales [or purchases] themselves." Zandford, supra, at 820, 122 S.Ct. 1899.
*1074 This significant language must apply here in order to implement two of Congress' purposes in passing SLUSA. First, SLUSA seeks to preclude a broad range of state-law securities claims in order to protect those who advise, counsel, and otherwise assist investors from abusive and multiplicitous *401 class actions designed to extract settlements from defendants vulnerable to litigation costs. This, in turn, protects the integrity of the markets. Second, even as the Act cuts back on the availability of state-law securities claims, a fair interpretation of its language ensures robust federal regulation of the national securities markets. That is because, in designing SLUSA, Congress "imported the key phrase" from § 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission (SEC) Rule 10b-5, which provide a private cause of action, as well as SEC enforcement authority, for securities fraud. Dabit, 547 U.S., at 79, 85, 126 S.Ct. 1503. As a result, that language must be " 'presumed to have the same meaning' " in SLUSA as it does in those contexts. Id., at 86, 126 S.Ct. 1503.
The Court's narrow interpretation of the Act's language will inhibit the SEC and litigants from using federal law to police frauds and abuses that undermine confidence in the national securities markets. Throughout the country, then, it will subject many persons and entities whose profession it is to give advice, counsel, and assistance in investing in the securities markets to complex and costly state-law litigation based on allegations of aiding or participating in transactions that are in fact regulated by the federal securities laws.
A
Congress enacted SLUSA and its predecessor, the Private Securities Litigation Reform Act of 1995, to reform "perceived abuses of the class-action vehicle in litigation involving nationally traded securities." Dabit, 547 U.S., at 81, 126 S.Ct. 1503. Congress found that these abuses were being used "to injure 'the entire U.S. economy.' " Ibid. The Act and its predecessor together addressed these problems by limiting damages, imposing heightened pleading standards, and, as most relevant here, precluding state-law claims involving nationally traded securities. 112 Stat. 3227; see S.Rep. No. 104-98, pp. 19-20 (1995) ; H.R.Rep. No. 105-640, p. 10 (1998) ; S.Rep. No. 105-182, pp. 3-4 (1998).
*402 In light of the Act's objectives, the Act must be given a "broad construction," because a "narrow reading of the statute would undercut the effectiveness" of Congress' reforms. Dabit, supra, at 86, 126 S.Ct. 1503. Today's decision does not heed that principle. The Court's narrow reading of the statute will permit proliferation of state-law class actions, forcing defendants to defend against multiple suits in various state fora. This state-law litigation will drive up legal costs for market participants and the secondary actors, such as lawyers, accountants, brokers, and advisers, who seek to rely on the stability that results from a national securities market regulated by federal law. See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 189, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). This is a serious burden to put on attorneys, accountants, brokers, and investment advisers nationwide; and that burden itself will make the national securities markets more costly and difficult to enter. The purpose of the Act is to preclude just these suits. By permitting the very state-law claims Congress intended to prohibit, the Court will undermine the primacy of federal law in policing abuses in the securities markets.
*1075 The Court casts its rule as allowing victims to recover against secondary actors under state law when they would not be able to recover under federal law due to Central Bank . Ante, at 1078, 1081. But in Dabit a unanimous Court rejected that conception of SLUSA. A federal-law claim was not available to the plaintiffs in Dabit because Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), limited the Rule 10b-5 private right of action to purchasers and sellers, not holders. "[T]he Second Circuit held that SLUSA only pre-empts state-law class action claims brought by plaintiffs who have a private remedy under federal law." 547 U.S., at 74, 126 S.Ct. 1503. The Court held the opposite, "concluding that SLUSA pre-empts state-law holder class-action claims." Id., at 87, 126 S.Ct. 1503."It would be odd, to say the least," the Court reasoned, "if SLUSA exempted that particularly troublesome subset of class actions from its pre-emptive sweep."
*403 Id., at 86, 126 S.Ct. 1503. The Court in Dabit also noted that SLUSA preclusion does not leave victims with "no" ability to "recover damages under state law." Ante, at 1072 - 1073. Rather, "[i]t simply denies plaintiffs the right to use the class-action device to vindicate certain claims." 547 U.S., at 87, 126 S.Ct. 1503. The Court in Dabit precluded the suit at issue in order to effect the purpose of Blue Chip . By following the opposite course today, the Court revisits Dabit 's logic and undermines Central Bank .
B
Congress intended to make "federal law, not state law, ... the principal vehicle for asserting class-action securities fraud claims." Dabit, supra, at 88, 126 S.Ct. 1503. And a broad construction of the "in connection with" language found in both SLUSA and Rule 10b-5 ensures an efficient and effective federal regulatory regime, one equal to the task of deterring and punishing fraud and providing compensation for victims.
In undertaking regulation of the national markets during the Great Depression, Congress sought to eliminate the "abuses which were found to have contributed to the stock market crash of 1929 and the depression of the 1930's." SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). " 'It requires but little appreciation ... of what happened in this country during the 1920's and 1930's to realize how essential it is that the highest ethical standards prevail' in every facet of the securities industry." Id., at 186-187, 84 S.Ct. 275 (quoting Silver v. New York Stock Exchange, 373 U.S. 341, 366, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963) ). In the Securities Exchange Act, Congress sought " 'to achieve a high standard of business ethics in the securities industry' " by " 'substitut[ing] a philosophy of full disclosure for the philosophy of caveat emptor .' " Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). To that end, Congress enacted § 10(b) "to insure honest securities markets and thereby promote investor confidence." United States v. O'Hagan, 521 U.S. 642, 658, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997).
*404 Investor confidence indicates fair dealing and integrity in the markets. See Dabit, supra, at 78, 126 S.Ct. 1503; O'Hagan, supra, at 658, 117 S.Ct. 2199; see also Central Bank, supra, at 188, 114 S.Ct. 1439. It also is critical to achieving an efficient market. The corollary to the principle that insider trading and other frauds have an " inhibiting impact on market participation" is that investor confidence in strong federal regulation to prevent these abuses inspires participation in the market. See *1076 O'Hagan, supra, at 659, 117 S.Ct. 2199. Widespread market participation in turn facilitates efficient allocation of capital to the Nation's companies. See also Central Bank, supra, at 188, 114 S.Ct. 1439.
C
Mindful of the ends of both SLUSA and Rule 10b-5, the Court's precedents interpret the key phrase in both laws to mean that a "misrepresentation or omission of a material fact" is made "in connection with the purchase or sale" of a security when the "fraud coincided with the sales [or purchases] themselves." Zandford, 535 U.S., at 820, 122 S.Ct. 1899; see also Dabit, supra, at 85, 126 S.Ct. 1503.
This litigation is very similar to Zandford and satisfies the coincides test it sets forth, and for similar reasons. In Zandford, the SEC brought a civil action against a broker, who, over a period of time, gained control of an investment account, sold its securities, and then pocketed the proceeds. 535 U.S., at 815-816, 122 S.Ct. 1899. The broker argued that "the sales themselves were perfectly lawful and that the subsequent misappropriation of the proceeds, though fraudulent, is not properly viewed as having the requisite connection with the sales." Id., at 820, 122 S.Ct. 1899. The Court rejected that argument. Although the transactions were lawful and separate from the misappropriations, the two were "not independent events." Ibid. Rather, the fraud "coincided with the sales," in part because the sales "further[ed]" the fraud. Ibid.
The Court likened the broker's fraud to that in Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co., 404 U.S. 6, 10, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), where the fraud victims were misled to *405 believe that they "would receive the proceeds of the sale" of securities. Zandford, 535 U.S., at 821, 122 S.Ct. 1899. Like the victims in Bankers Life, the victims in Zandford "were injured as investors through [the broker]'s deceptions" because "[t]hey were duped into believing that [the broker] would 'conservatively invest' their assets in the stock market and that any transactions made on their behalf would be for their benefit." Id., at 822, 122 S.Ct. 1899. Both suffered losses because they were victims of dishonest intermediaries or fiduciaries. See also In re Richard J. Line, 62 S.E.C. Docket 2879 (1996) (broker who induced parents to transfer funds to him to invest in securities so as to temporarily hide them during the college financial aid application process, but then failed to return the money, violated Rule 10b-5).
Here, just as in Zandford, the victims parted with their money based on a fraudster's promise to invest it on their behalf by purchases and sales in the securities markets. The investors had-or were led to believe they could have-the advantages of Stanford's and SIB's expertise in investments in the national market. So here, as in Zandford, the success of the fraud turned on the promise to trade in regulated securities. According to the complaints, SIB represented that it would " 're-inves[t]' " the plaintiffs' money on their behalf in "a well-diversified portfolio of highly marketable securities issued by stable national governments, strong multinational companies, and major international banks" to ensure a "safe, liquid," and above-market return. See App. 244, 249, 250, 253, 336, 342, 345, 444, 470, 480, 628. The misrepresentation was about nationally traded securities and lent credence to SIB's promise that the CDs were a liquid investment that "could be redeemed with just a few days' notice." See id., at 253, 345, 445, 628. The CDs, SIB explained, would be backed by nationally traded securities. As a result, according to the complaints, the misrepresentation was "material."
*1077 Id., at 244-245, 336-338, 480, 715. The fraud could not have succeeded without the misrepresentation *406 : The investors gave SIB money because they expected it to be invested in the national securities markets. The connection between the promised purchases and the misrepresentation is more direct than in Zandford, because the misrepresentation was essential to the fraud.
Here, and again just as in Zandford, the fraud was not complete until the representation about securities transactions became untrue, just as Stanford intended all along. Instead of purchasing covered securities, SIB purchased some but fewer covered securities than it promised-only 10% of its portfolio, according to an affidavit attached to a complaint-and primarily speculated in Caribbean real estate. Brief for Respondents 37; App. 594; but see Tr. of Oral Arg. 43-44 (suggesting SIB did not purchase securities). It was not until SIB rendered the CDs illiquid by failing to make substantial investments in the nationally traded securities it promised that the fraud was consummated. At that point, SIB blocked the plaintiffs' access to the market. The fraud and SIB's failure to purchase all that it promised were not independent events. Rather, the false promises to invest in covered securities enabled and furthered the CD fraud. Without the false promise, there would have been no money to purchase the covered securities. On these facts, this Court's controlling precedents instruct that these misrepresentations were made "in connection with the purchase or sale" of regulated securities; and, as a result, state-law claims concerning them should be precluded.
Dabit provides further support for this conclusion. There, the Court held that an investment bank that deceived brokers into advising their clients to hold covered securities made misrepresentations "in connection with the purchase or sale of a covered security." "Under our precedents," the Court explained, "it is enough that the fraud alleged 'coincide' with a securities transaction-whether by the plaintiff or by someone else." 547 U.S., at 85, 126 S.Ct. 1503. It did not matter that the plaintiffs did not purchase or sell securities, because *407 they were participants in the national markets: " The requisite showing, in other words," is " 'deception "in connection with the purchase or sale of any security," not deception of an identifiable purchaser or seller.' " Ibid. (quoting O'Hagan, 521 U.S., at 658, 117 S.Ct. 2199). Here, for like reasons, it does not matter that the fraud victims, as opposed to Stanford and SIB, were not the ones to fail to invest in the market. The very essence of the fraud was to induce purchase of the CDs on the (false) promise that investors should rely on SIB's special skills and expertise in making market investments in covered securities on their behalf. If promises related to covered securities are integral to the fraud in this direct way, federal regulation is necessary if confidence in the market is to be maintained.
That interest is at stake here. Because confidence in the ability to act as an investor without diversion of funds by intermediaries and insiders is critical, it does not matter if the victim of a fraud does not purchase or sell a security, Dabit,supra, at 85, 126 S.Ct. 1503; or if the sale or purchase does not occur at the same time as the deception, Bankers Life, 404 U.S., at 12-13, 92 S.Ct. 165; or if no party to the actual transaction is deceived by the fraud, O'Hagan, supra, at 656, 117 S.Ct. 2199; or if the misrepresentation has nothing to do with the value of a covered security, Zandford, 535 U.S., at 820, 122 S.Ct. 1899. An investor's confidence in the market, and willingness to participate in it, may be severely undermined if frauds like the one *1078 here are not within the reach of federal regulation. Frauds like this one undermine investor confidence in attorneys, accountants, brokers, and investment advisers, the intermediaries on whom investors depend to gain access to the market. And when frauds are as widespread as this one, the market as a whole is weakened because investors, including sophisticated ones, are misled as to the amount of funds committed to the market and its consequent stability and resilience.
The rule that SLUSA applies when a misrepresentation about the market is coincident to the fraud is, then, *408 essential to the framework of the Act and to federal securities regulation. Fraudulent practices " 'constantly vary,' " and " 'practices legitimate for some purposes may be turned to illegitimate and fraudulent means.' " Bankers Life, supra, at 12, 92 S.Ct. 165. That is why the key language "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes." Zandford,supra, at 819, 122 S.Ct. 1899 (internal quotation marks omitted); see Affiliated Ute, 406 U.S., at 151, 92 S.Ct. 1456. The language merits a "broad interpretation" because it is part of a residuary provision that must be able to accommodate evolving methods of fraud by intermediaries and insiders in ever more complicated securities markets. Central Bank, 511 U.S., at 174, 114 S.Ct. 1439. Its interpretation should not privilege fraudsters who devise ever more devious methods of committing fraud involving covered securities.
At the same time, the submitted interpretation is not so broad as to "convert every common-law fraud that happens to involve securities into a violation of § 10(b)" or preclude all state tort claims that involve securities in a tangential way. Zandford, supra, at 820, 122 S.Ct. 1899. So, for example, the statutory language does not extend to cover a thief who steals money from a store to buy securities or to a fraudster who defrauds a bank for a loan that he uses to buy securities. See O'Hagan, supra, at 656, 117 S.Ct. 2199. The victims in those cases are not concerned about their ability to act as investors but rather about their duties as a store clerk or a loan officer. Those frauds involve securities transactions only as happenstance. As a result, the interpretation submitted in this dissent strikes the balance that Congress intended between forbidding frauds by intermediaries in the market without reaching frauds that touch the markets in only tangential ways.
The key question is whether the misrepresentation coincides with the purchase or sale of a covered security or the purchase or sale of the securities is what enables the fraud. Stanford's misrepresentation did so. Stanford promised to *409 purchase covered securities for investors, using his special expertise, thus allowing investors to rely on his skill to participate in the national securities markets. The entire scheme rested on investors falling for the trick. When covered securities are so integral to the fraud, the false promise is incident to the purchase or sale of regulated securities because it coincides with it, and the misrepresentation respecting national securities enabled the fraud.
D
The Court interprets the phrase "misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security"-the key phrase in SLUSA and Rule 10b-5-in a different manner. The result, it is submitted, is inconsistent with the statutory scheme Congress enacted and casts doubt on the applicability of federal securities law to cases of serious securities fraud.
*1079 The Court construes the text of SLUSA and Rule 10b-5 to require a misrepresentation that "is material to a decision by one or more individuals (other than the fraudster) to buy or sell a 'covered security.' " Ante, at 1066. The Act simply does not say that the purchase or sale-or the promise to make a purchase or sale-must be by one other than the fraudster. Rather the Act states that there must be "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1)(A). See 17 C.F.R. § 240.10b-5 (2013) (requiring an "untrue statement of a material fact" "in connection with the purchase or sale of any security"). The Court narrows the statute Congress wrote in two ways. It excises the important "in connection with" language, resulting in a confined reading inconsistent with the Act's purpose, structure, and operation. And, by requiring the purchase or sale be made by someone "other than the fraudster," the Court inserts a limiting phrase that nowhere appears in the language of the provisions. In litigation like this, this new rule has it upside down. When the violation that adversely affects *410 the securities market is done by the fraudster himself, that is all the more reason for applying federal law. This is not a case where Congress has limited its coverage to a certain subset of purchasers. Congress enacted such a limit two subsections later in SLUSA when detailing which actions are not precluded. See 15 U.S.C. § 78bb(f)(3)(A)(ii)(I) ("the purchase or sale of securities by the issuer or an affiliate of the issuer exclusively from or to holders of equity securities of the issuer"). But it did not do so in the provision at issue.
The Court's reconstruction of the language of the provisions also casts doubt on the applicability of federal securities law to three established instances of federal securities fraud and one instance of preclusion under the Act as adjudged by the Court and the SEC in earlier cases.
First, the Court's interpretation necessarily suggests that Zandford is incorrect and that dishonest brokers need not fear Rule 10b-5 liability. The deceit in Zandford was that the broker would act as the victim's fiduciary when in fact he planned on selling (and did sell) the investor's securities for his own benefit. 535 U.S., at 820, 122 S.Ct. 1899; see also Line, 62 S.E.C. Docket 2879 (broker's deceit was false promise to buy). The Court's rule that liability must rest on a finding that someone other than the fraudster purchased or sold securities is inconsistent with Zandford, where the recipient of the misrepresentation did not buy or sell. The Court's opinion disregards the hazards to the market when the fraudster is the one acting in the market and frustrates the investment objectives of his victims.
Second, the Court's interpretation is difficult to reconcile with liability for insider trading. In O'Hagan, the Court held that the "in connection with" element "is satisfied because the fiduciary's fraud is consummated, not when the fiduciary gains the confidential information, but when, without disclosure to his principal, he uses the information to purchase or sell securities," "even though the person or entity defrauded is not the other party to the trade."
*411 521 U.S., at 656, 117 S.Ct. 2199. The Court's requirement that someone other than the fraudster purchase or sell a security is hard to square with O'Hagan .
Third, the Court's interpretation is difficult to square with the SEC's position in In re Orlando Joseph Jett, 82 S.E.C. Docket 1211 (2004). There, the SEC held liable a trader who fabricated complex trades to supplement the returns of his real trades, so as to increase his standing in his company. The SEC likened Jett to "garden- *1080 variety securities fraud cases in which a broker-dealer or investment adviser engages in unsuccessful securities trades for a client and then hides the losses or inflates the profits by sending out false account statements." Id., at 1253. The decision of the Court today would require that Jett's misrepresentation led to the purchase or sale of securities by someone other than Jett. But the SEC found Jett's own purchases and sales to be sufficient to come within the securities laws.
Finally, the Court's analysis is inconsistent with the unanimous opinion in Dabit, which interpreted the same statutory language at issue in this litigation. Dabit squarely rejected the view that "an alleged fraud is 'in connection with' a purchase or sale of securities only when the plaintiff himself was defrauded into purchasing or selling particular securities." 547 U.S., at 85, 126 S.Ct. 1503. Instead, it approved the SEC's interpretation that a broker who " 'sells customer securities with intent to misappropriate the proceeds' " satisfies the "in connection with the purchase or sale" requirement. Ibid., n. 10.Dabit cannot be reconciled with today's decision to require someone other than the fraudster buy or sell a security.
It is correct that there is no case precisely standing for the proposition that a victim does not have to take an ownership position. However, O'Hagan supports that view. O'Hagan clearly states that in insider trading cases "the person or entity defrauded is not the other party to the trade." 521 U.S., at 656, 117 S.Ct. 2199. And in Zandford a fraudster told customers he would invest "their money" in securities and then sold *412 those securities. 535 U.S., at 815, 122 S.Ct. 1899. Here the fraudster told plaintiffs that he would "re-invest" "their" money in securities and then bought different securities. App. 250, 470, 715. The only difference is that there the fraudster sold and here he bought. Federal regulation should not turn on whether a fraudster arrives before or after an investor makes his first purchase.
II
The Court's interpretation also introduces confusion into securities law by not defining what it means for someone "other than the fraudster to buy or sell" a security, a rule that it derives from its view that the precedents all involve victims who had an ownership interest in securities. Ante, at 1076 - 1077. The precedents the Court cites involve what the parties have called direct ownership, where the victim buys or sells an entire equity. By using the term ownership interest instead of ownership, the Court also appears to accept the respondents' concession that indirect ownership, where the victim buys or sells shares in a defendant fund that itself owns equities, is sufficient in certain circumstances, such as when a victim has "some interest in the defendant's supposed portfolio." Brief for Respondents 16.
An ownership rule distinguishing between different types of indirect ownership is unworkable. Indirect ownership is a common type of investment. See M. Fink, The Rise of Mutual Funds 1 (2008) (U.S. mutual funds have over 88 million American shareholders and over $11 trillion in assets). Yet whether indirect ownership involves an interest in the underlying equities is a complex question of corporation, LLC, or partnership law. See In re Bernard L. Madoff Inv. Securities LLC, 708 F.3d 422, 427 (C.A.2 2013). Congress likely did not intend preclusion of state-law suits to depend on the complexities of the Delaware Code.
The Court's ownership approach also casts doubt on the scope of Rule 10b-5. Under the Court's interpretation, § 10(b) applies to fraudulent mutual or hedge *1081 funds not *413 because those funds invest in securities but because investments in the funds are securities. But not all such investments are securities. 2 L. Ribstein & R. Keatinge, Limited Liability Companies § 14:2 (2010) (discussing test for a security from SEC v. W.J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) ); 1 H. Bloomenthal & S. Wolff, Securities Law Handbook §§ 2:3 to 2:4 (2010). For those that are not, the Court seems to envision liability only when the investment confers an ownership interest in the fund's securities. And the general rule for investments in funds organized as LLPs and LLCs is that they do not convey such claims. 1 Ribstein & Keatinge, supra, § 7:11; see In re Herald, 730 F.3d 112 (C.A.2 2013). As a result, in important instances Rule 10b-5 may not extend to mutual and hedge funds under the Court's interpretation.
It is true that the SEC pursued the fraudster with success here. But that is because the CDs are securities. See Order Denying Motion to Dismiss in SEC v. Stanford International Bank, No. 3-09-CV-0298-N (N.D.Tex., Nov. 30, 2011), pp. 5-10. This aspect of Stanford's fraud is not a necessary feature of all frauds involving funds similar to SIB.
III
The fraudster in this litigation misrepresented that he would purchase nationally traded securities. That misrepresentation was made "in connection with the purchase or sale" of the promised securities because it coincided with them. The fraud turned on the misrepresentation. The Court's contrary interpretation excises the phrase "in connection with" from the Act, a phrase that the Court in earlier cases held to require a broad and flexible meaning. At the same time, by holding that the purchase or sale of securities be made by someone other than the fraudster, the Court engrafts a limitation that does not appear in the text. The result is to constrict the application of federal securities regulation in instances where dishonest brokers, insider traders, and lying employees purchase or sell securities, or promise *414 to do so, as part of the fraud. Today's decision introduces confusion in the enforcement of securities laws.
For these reasons, it is submitted that the judgment of the Court of Appeals should be reversed.

The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.