# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 11-1095

SUSAN APPERT, individually and on behalf of
all others similarly situated,

*Plaintiff-Appellant*,

*v.*

MORGAN STANLEY DEAN WITTER, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CV 7130—**David H. Coar**, *Judge.*

ARGUED SEPTEMBER 14, 2011—DECIDED MARCH 8, 2012

Before WOOD, TINDER, and HAMILTON, *Circuit Judges.*

TINDER, *Circuit Judge.* Morgan Stanley entered into
agreements with its customers that set a fee for
handling, postage, and insurance (HPI) for mailing trade
confirmation slips after each purchase or sale of secu-
rities. Plaintiff, Susan Appert, filed this breach of con-
tract action in state court seeking class certification and
recovery of these fees charged to customers from 1998

through the present. Morgan Stanley removed the action to federal court asserting jurisdiction pursuant to the Class Action Fairness Act of 2005 (CAFA), 28 U.S.C. § 1332(d), or alternatively, the Securities Litigation Uniform Standards Act (SLUSA), 15 U.S.C. § 78p(b) and (c) and § 78bb(f), and moved for dismissal. The district court granted Morgan Stanley's motion, but allowed Appert leave to file an amended complaint. Appert amended her breach of contract claim and also brought a related claim for unjust enrichment. She alleges that Morgan Stanley breached the Client Account Agreement (Agreement) by charging an HPI fee that bore no relationship and was grossly disproportionate to Morgan Stanley's actual transaction costs. Morgan Stanley again moved for dismissal, arguing that SLUSA barred Appert's suit or, alternatively, that Appert failed to state a claim for relief. The district court agreed and dismissed Appert's amended complaint.

As an initial matter, we must satisfy ourselves that jurisdiction is secure. We find, relying on *Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539 (2d Cir. 1996), that SLUSA doesn't apply because any alleged misrepresentation (though pled as a breach of contract we assume for purposes of this discussion that Appert's claim is for misrepresentation) that the stated HPI fee was tied to actual costs was not *material* to investors' decisions to buy or sell securities. Morgan Stanley, however, met its burden of showing that CAFA's general jurisdictional requirements were met, *see* 28 U.S.C. § 1332(d)(2), and Appert has not shown that the securities exception to

CAFA jurisdiction applies. *See* 28 U.S.C. §§ 1332(d)(9) (subject matter jurisdiction) and 1453(d) (removal).

We affirm the district court's order dismissing Appert's amended complaint. The language in the Agreement doesn't suggest that the HPI fee represents Morgan Stanley's actual costs, and it was not reasonable to read this into the agreement. Nor did Morgan Stanley have an implied duty under applicable New York law to charge a fee that was reasonably proportionate to actual costs where it notified customers in advance of the charges and they were free to decide whether to continue business with Morgan Stanley. We also affirm dismissal of Appert's unjust enrichment claim because this dispute is governed by the express terms of the Agreement.

## I.  Facts

Morgan Stanley is a financial services firm that offers brokerage and investment advisory services. Appert had an investment account with Morgan Stanley from 1999 through 2005 and, under their Agreement, Morgan Stanley charged her (and other putative class members) an HPI fee of $2.35 per transaction. The Agreement stated: "Other miscellaneous account fees and charges include: handling, postage and insurance (HPI) at $2.35 per transaction . . . ." Appert alleged that the purpose of the fee was to cover the cost of producing and delivering trade confirmation slips that broker-dealers are required to provide customers after securities transactions. Morgan Stanley had expressly described the fee as a "[p]rocessing fee associated with the production and

delivery of certain trade confirmations." The Agreement provided that "[i]n special circumstances, additional fees and charges may apply . . . . All fees are subject to change, and you will be notified in the event of any changes." It further provided that "[i]t is the client's responsibility to seek immediate clarification about entries that the client does not clearly understand."

In 2002, Morgan Stanley raised the HPI fee from $2.35 to $5.00, and again in 2005 to $5.25. There is no dispute that Morgan Stanley informed its customers of these increases as required by the Agreement. Morgan Stanley withdrew the fee directly from funds Appert maintained in her Morgan Stanley account before her receipt of each confirmation. Morgan Stanley did not disclose the actual costs incurred for HPI with regard to any transaction.

Appert attached to her initial complaint a trade confirmation slip from Morgan Stanley dated April 2004 setting forth the fee; on the back it defines various "charges and fees" and states that the HPI fee "[r]epresents charges for handling, insurance and postage, if any." Some of the fees listed on the confirmation slip specifically indicate that they were "pass through" charges. The HPI fee, however, doesn't indicate that it was a "pass through" charge.

Appert alleges that Morgan Stanley charged the fee without regard to (1) whether any insurance was applicable to the transaction; (2) the actual amount of postage used; (3) whether multiple confirmations were sent in a single mailing; (4) whether the production

and handling of the confirmation required human intervention or was computer generated; or (5) the actual cost of delivering the confirmation. The fee, Appert alleges, is substantially less than Morgan Stanley's actual costs for HPI in producing and delivering the trade confirmations. As of 2002, the average total cost to produce and deliver the physical confirmation was approximately 42 cents per confirmation. The handling component was outsourced to a third party vendor and, as of 2002, cost approximately 9 cents per confirmation. The average postage cost for mailing the confirmation, as of 2002, was less than 30 cents, which later increased to 36 cents. Appert also alleges that there was no applicable insurance for the delivery of the trade confirmations.

Appert's initial class action complaint alleged breach of contract based on the incorporation of NASD and NASDAQ Stock Market rules. The district court dismissed that complaint finding no private right of action under these exchange rules and that even if she stated a claim, it was precluded by SLUSA. Appert filed an amended class action complaint setting forth the allegations above, but instead of basing the breach of contract claim on the incorporation of NASD and NASDAQ Stock Market rules, she alleges that by charging more than its costs associated with the creation and delivery of the trade confirmation slips, Morgan Stanley breached its agreement with her and the class she seeks to represent. Appert further alleges that the HPI fee was not objectively material to Appert's or any class members' investment decisions and was not incurred in connection with a securities

transaction. She also brought a related claim for unjust enrichment.

To support her allegations, Appert attaches to her amended complaint a series of internal email communications where Morgan Stanley personnel discussed Morgan Stanley's expected profits from the HPI fees. The following email exchange took place:

> George Rosenberger: Initial estimates are that each "Regular" trade confirmation currently costs us $0.41. In June, when the postal increase takes effect, they will cost us $0.435 (+$0.025) each. We are having a call with Vestcom tomorrow to confirm all of our unit costs.

> Sandra Motusesky: Wow, are we saying then that the rest of the cost we charge above that 43 cents is all profit? Is this cost just postage or "handling" too?

> George Rosenberger: Sandy, That is the postage and handling charge from Vestcom. Subtract that amount from the $2.35, soon to be $5.00, is all profit.

Morgan Stanley moved to dismiss the amended complaint and the district court granted the motion, reasoning that Appert failed to state a breach of contract claim because the Agreement set forth a fixed fee for HPI and Morgan Stanley charged that fee. The Agreement, the court found, didn't require Morgan Stanley to charge a fee that related to its actual costs. Further, the court concluded that because Appert's Agreement was

"not silent, unclear, or ambiguous" as to how much Morgan Stanley could charge for HPI fees, her unjust enrichment claim fails. The court also explained that "[i]f the processing fee was material to Appert's securities transaction, then her suit is preempted by SLUSA for the reasons set forth [in the court's dismissal of the original complaint]. If the fee was immaterial to the agreement between the parties, Appert is left without legal recourse." Appert appeals dismissal of her initial and amended complaints.

## II.  Subject Matter Jurisdiction

Before diving into the merits, we must first address subject matter jurisdiction. We begin with SLUSA. Congress enacted SLUSA in response to the marginal success that the Private Securities Litigation Reform Act of 1995 (Reform Act) had in achieving its goal of preventing strike suits in securities class action litigation. *See* Pub. L. No. 105-353 §§ 2(1)-(5). Under the Reform Act, litigants would avoid the statute's enhanced controls over securities class actions by filing their actions in state courts, alleging violations of state statutory or common law. *See Merrill Lynch, Pierce, Fenner & Smith v. Dabit*, 547 U.S. 71, 81-82 (2006). SLUSA was designed to prevent evasion of the Reform Act's requirements. *See Lander v. Hartford Life & Annuity Ins. Co.,* 251 F.3d 101, 107-08 (2d Cir. 2001).

SLUSA allows removal of a complaint brought in state court if it (1) is brought by a private party; (2) is brought as a covered class action; (3) is based on state law;

(4) alleges that the defendant misrepresented or omitted a *material fact* or employed a manipulative device or contrivance; and (5) asserts that defendant did so in connection with the purchase or sale of a covered security. *See Erb v. Alliance Capital Mgmt.*, 423 F.3d 647, 651 (7th Cir. 2005); *see also* 15 U.S.C. §§ 77p(c), 78bb(f)(2). A suit properly removed under SLUSA must be dismissed because a suit based on fraud in the sale of securities regulated under the federal securities laws cannot be brought under state law. *See* 15 U.S.C. §§ 77p(b), 78bb(f)(1). Thus, an action precluded by SLUSA cannot be entertained in state or federal court. *See Kircher v. Putnam Funds Trust*, 547 U.S. 633, 644 (2006). If the action is not precluded, and there is no other basis for federal jurisdiction, "the proper course is to remand" to state court. *See Brown v. Calamos*, 664 F.3d 123, 128 (7th Cir. 2011) ("If SLUSA is not a bar to the suit, the federal court lacks jurisdiction (unless there is a basis for federal removal jurisdiction other than SLUSA) except to determine that it has no jurisdiction.").

Morgan Stanley's SLUSA argument fails because it cannot show that Appert alleged a misstatement or omission of a *material* fact. A fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding whether to buy or sell a security. *See Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)). The "reasonable investor" standard ensures that investors have access to information important to their investment decisions; the Supreme Court has been "careful not to set too low a

standard of materiality, for fear that management would bury the shareholders in an avalanche of trivial information." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318-19 (2011) ("[M]ateriality requirement is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available'") (quoting *Basic*, 485 U.S. at 231-32)); *see also S.E.C. v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998) ("[M]ateriality . . . covers whatever is important enough to reasonable participants in an investment decision to alter their behavior.").

The Second Circuit has already held under § 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. §78j(b), and Securities and Exchange Commission (SEC) Rule 10b-5, 17 C.F.R. § 240.10b-5, that an alleged misrepresentation or omission as to these fees is not material to an investor's decision to buy or sell a security. *See Feinman*, 84 F.3d at 541. The language in SLUSA is similar to that in § 10(b) and Rule 10b-5 and there is no basis to construe "materiality" differently under these provisions. *See Dabit*, 547 U.S. at 86. "Generally, identical words used in different parts of the same statute are . . . presumed to have the same meaning." *Id.* (quotations omitted).

The class action complaint in *Feinman* challenged the practices of several of the nation's largest stock brokerage firms, including Dean Witter Reynolds, Inc. (which later merged with Morgan Stanley), in the labeling of their charges for securities transactions. *See* 84 F.3d at 540. The

plaintiffs alleged that the firms charged hidden commissions on every transaction, mislabeling their charges as transaction fees on confirmation slips supplied to the customer. *Id.* Each of the defendants routinely charged a transaction fee, ranging from $2.35 to $4.85 for each purchase or sale processed. The fees for Dean Witter were identified as covering "handling, postage and insurance if any." The plaintiffs alleged that the fees far exceeded the cost to the firms for these items and represented hidden, fixed commissions, disguised to circumvent rules prohibiting fixed rates and to prevent customers from negotiating the fees. *Id.*

The court in *Feinman* found that the alleged misstatements were not material for purposes of a securities fraud claim under § 10(b). The court stated that "where the alleged misstatements are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance, a court may find the misstatements immaterial as a matter of law." *Id.* at 541 (quotations omitted). The court concluded that "no reasonable investor would have considered it important, in deciding whether or not to buy or sell stock, that a transaction fee of a few dollars might exceed the broker's actual handling charges." *Id.* The court further noted that the confirmation slips set forth the fee amount and the plaintiffs were never charged more than the amounts reported on these slips. *Id.* According to the court, "reasonable minds could not find that an individual investing in the stock market would be affected in a decision to purchase or sell a security by knowledge that the broker was pocketing

a dollar or two of the fee charged for the transaction." *Id.* "If brokerage firms are slightly inflating the cost of their transaction fees, the remedy is competition among the firms in the labeling and pricing of their services, not resort to the securities fraud provisions." *Id.*

*Feinman* is indistinguishable from this case and we find its reasoning persuasive. We therefore agree with Appert that whether Morgan Stanley improperly inflated the HPI fee to include a profit is not objectively material to Appert's or any class members' investment decisions.[1]

SLUSA doesn't bar this suit and didn't provide Morgan Stanley with a basis for removal. Morgan Stanley, however, also relies, in the alternative, on CAFA for jurisdiction and asserted in its notice of removal that "CAFA and SLUSA operate as complements, since any case to which SLUSA applies, CAFA expressly excepts

---

[1] Morgan Stanley also argues that even if the fee is not material, Appert's allegations must be read to encompass "deceptive" conduct or a "contrivance." Morgan Stanley correctly notes that SLUSA preempts actions alleging "that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1)(B). Morgan Stanley's argument on this score consists of one paragraph and provides no support that an immaterial omission or misstatement can constitute a "deceptive device or contrivance" under the statute. Morgan Stanley's perfunctory and undeveloped arguments unsupported by pertinent authority are waived. *Argyropoulos v. City of Alton*, 539 F.3d 724, 739 (7th Cir. 2008).

from its gambit," citing 28 U.S.C. § 1453(d)(1). The party invoking federal jurisdiction bears the burden of demonstrating its existence. *Hart v. FedEx Ground Package Sys. Inc.*, 457 F.3d 675, 679 (7th Cir. 2006). Morgan Stanley has shown that the general requirements for CAFA jurisdiction are met: minimal diversity exists between the parties, the class exceeds 100 members, and Morgan Stanley asserted that the amount in controversy exceeds $5 million because it conducted tens of thousands of transactions each year to which the alleged $5.00 fee[2] applied during the relevant class period (1998 through 2008 when the case was removed). *See Hart*, 457 F.3d at 679 (citing 28 U.S.C. §§ 1332(d)(2), (d)(5)). Appert doesn't contest the amount in controversy and Morgan Stanley has provided a good-faith estimate that plausibly explains how the stakes exceed $5 million. That is sufficient. *See Blomberg v. Service Corp. Int'l,* 639 F.3d 761, 763-64 (7th Cir. 2011); *see also Spivey v. Vertrue, Inc.*, 528 F.3d 982, 986 (7th Cir. 2008) (amount in controversy is a pleading requirement, not a demand for proof).

But we cannot end our jurisdictional discussion without addressing CAFA's securities exception. *See* 28 U.S.C. § 1332(d)(9). CAFA was enacted to "grant[ ] broad federal jurisdiction over class actions and establishes

---

[2] In her initial complaint, Appert alleged that at all relevant times Morgan Stanley charged a $5.00 HPI fee for each transaction; our focus is on the complaint filed at the time of removal, not the subsequent amended complaint. *See Tropp v. Western-Southern Life Ins. Co.,* 381 F.3d 591, 595 (7th Cir. 2004).

narrow exceptions to such jurisdiction." *Westerfeld v. Indep. Processing, LLC*, 621 F.3d 819, 822 (8th Cir. 2010) (citing S. Rep. No. 109-14, at 43 (2005), *reprinted in* 2005 U.S.C.C.A.N. 3, 41); *see also* S. Rep. 109-14, at 45 (stating that "Committee intends that this exemption be narrowly construed"). The exception in subsection (d)(9) applies "to any class action that solely involves a claim—(A) concerning a covered security . . ." or "(C) that relates to the rights, duties . . ., and obligations relating to or created by or pursuant to any security . . . ." 28 U.S.C. § 1332(d)(9)(A) and (C); *see also* 28 U.S.C. § 1453(d)(1) and (3) (class action removal statute).

Although the removing party bears the burden of establishing the general requirements of CAFA jurisdiction, this court has not yet addressed who bears the burden of addressing § 1332(d)(9). In *Hart,* we held that the party seeking remand has the burden to show that the home-state and local controversy exceptions in § 1332(d)(4) are met, 457 F.3d at 680, and several courts have stated generally that the party seeking remand has the burden to establish any exception to CAFA jurisdiction, *see Evans v. Walter Indus., Inc.,* 449 F.3d 1159, 1164 (11th Cir. 2006) ("[W]hen a party seeks to avail itself of an express statutory exception to federal jurisdiction granted under CAFA, . . . we hold that the party seeking remand bears the burden of proof with regard to that exception.") (citing *Breuer v. Jim's Concrete of Brevard, Inc.*, 538 U.S. 691, 697-98 (2003) (holding that when a defendant removes a case under 28 U.S.C. § 1441(a), the burden is on a plaintiff to find an express exception to removal)). The Second Circuit has also

indicated that the burden of addressing subsection (d)(9) is on the party seeking remand. *See Greenwich Fin. Serv. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp.*, 603 F.3d 23, 29 (2d Cir. 2010).

Subsection (d)(4) of CAFA states that a "district court *shall decline* to exercise jurisdiction" when either the local or the home state factors are present. 28 U.S.C. § 1332(d)(4) (emphasis added). We found that although this language "commands the district courts to decline jurisdiction" in those instances, it was reasonable to understand these as two "express exceptions" to CAFA's normal jurisdictional rule, and thus, the party seeking remand has the burden to show that they apply. *Hart*, 457 F.3d at 682. Subsection (d)(9), in contrast, states that jurisdiction as set forth in subsection (d)(2) "*shall not apply* to any class action that solely involves a claim— . . . ." 28 U.S.C. 1332(d)(9) (emphasis added). Subsection (d)(5) contains similar language, stating that subsections (d)(2)-(4) "*shall not apply* to any class action in which—(A) the primary defendants are States, State officials, or other governmental entities . . .; or (B) the number of members of all proposed plaintiff classes in the aggregate is less than 100." 28 U.S.C. § 1332(d)(5) (emphasis added).

We implied in *Hart* that subsection (d)(5) was a prerequisite to establishing jurisdiction by stating that CAFA gives "federal courts original jurisdiction in class actions where" the requirements of subsections (d)(2) and (d)(5) are met. 457 F.3d at 679. The Fifth and Ninth Circuits have come to different conclusions on whether subsec-

tion (d)(5) is a prerequisite or an exception to jurisdiction. *Compare Frazier v. Pioneer Americas LLC*, 455 F.3d 542, 546 (5th Cir. 2006) (characterizing subsections (d)(3)-(d)(5) as "exceptions" to CAFA jurisdiction), *with Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1020 n.3 & 1022 (9th Cir. 2007) (disagreeing with the Fifth Circuit, reasoning that the language in subsection (d)(5) makes it a prerequisite, rather than an exception, to jurisdiction unlike subsection (d)(4), which contains language implying that a district court has jurisdiction but must decline to exercise it in certain situations).

As noted, subsections (d)(5) and (d)(9) contain similar language—"shall not apply"—and generally, the same phrase within the same statute is to be given the same meaning. *See Dabit*, 547 U.S. at 86; *see also Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 990 (7th Cir. 2001). There is, however, one notable difference in the statutory language. Subsection (d)(5) states that subsection (d)(2)—the general jurisdiction provision—*and* the exceptions in subsections (d)(3)-(4) don't apply when the requirements of subsection (d)(5) are met, suggesting that subsection (d)(5) is not itself an exception. In contrast, subsection (d)(9) merely states that subsection (d)(2) doesn't apply when the requirements therein are met.

We, however, need not decide whether subsection (d)(5) serves as a prerequisite or exception to jurisdiction because Congress's intent to construe subsection (d)(9) as an exception is otherwise evident from 28 U.S.C. § 1453. Section 1453(b) allows removal of any class action brought within federal jurisdiction by § 1332(d), and § 1453(d) adds: **"Exception**.—This section shall not

apply to any class action that solely involves—(1) a claim concerning a covered security . . . or (3) a claim that relates to the rights, duties . . . and obligations relating to or created by or pursuant to any security . . . ." 28 U.S.C. § 1453(d). Although the heading of a section cannot limit the plain meaning of the statutory text, it is useful when it sheds light on ambiguous language. *See Active Disposal, Inc. v. City of Darien*, 635 F.3d 883, 886 (stating that even though a statute's title does not define its meaning, it is relevant to the court's construction of the statute); *see also United States v. Clawson*, 650 F.3d 530, 536 (4th Cir. 2011).

Further, our circuit and others have expressly identified subsection (d)(9) as an exception. *See Katz v. Gerardi*, 552 F.3d 558, 562 (7th Cir. 2009) ("[S]ecurities class actions covered by [CAFA] are removable, subject to the *exceptions* in § 1332(d)(9) and § 1453(d).") (emphasis added); *see also Lincoln Nat'l Life Ins. Co. v. Bezich*, 610 F.3d 448, 449 (7th Cir. 2010) (describing subsection (d)(9) as an exception); *Greenwich Fin. Servs.*, 603 F.3d at 27 (same); *Ferrell v. Express Check Advance of SC LLC*, 591 F.3d 698, 705 (4th Cir. 2010) (same).

We conclude that Appert has the burden to show that the securities exception applies. Appert hasn't sought remand or even argued that the exception applies; it is tempting to construe this as a concession and decide that we need not have further concern about the exception and stop there. But given that this suit raises concern over our subject matter jurisdiction, we forge ahead and address it sua sponte. *Buchel-Ruegsegger v.*

*Buchel,* 576 F.3d 451, 453 (7th Cir. 2009) (quotations omitted); *see also Preston v. Tenet Healthsys. Mem'l Med. Ctr., Inc.,* 485 F.3d 804, 812 n.2 (5th Cir. 2007) (addressing discretionary exception in § 1332(d)(3)).

We begin with the exception in subsection (d)(9)(C), which applies to "any security." The definition of "security" is broad, encompassing "virtually any instrument that might be sold as an investment." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990). We must answer whether the alleged misconduct relates to the rights, duties, and obligations relating to or created by or pursuant to any security. The Second Circuit construed this language in *Estate of Pew v. Cardarelli*, 527 F.3d 25 (2d Cir. 2008) and found that "[t]he sentence as a whole cannot be read to cover any and all claims that relate to any security," because that would render the terms of limitation in that subsection ("rights, duties and obligations" and "relating to or created by or pursuant to") meaningless. *Id.* at 31. Such an interpretation would also render the other securities related exception, § 1332(d)(9)(A), which excludes jurisdiction for covered securities, completely superfluous. *Id.* The court concluded that claims that "relate . . . to the rights, duties . . . and obligations created by or pursuant to a security must be claims grounded in the terms of the security itself, the kind of claims that might arise where the interest rate was pegged to a rate set by a bank that later merges into another bank, or where a bond series is discontinued, or where a failure to negotiate replacement credit results in a default on principal." *Id.* at 31-32 (quotations omitted); *see also Katz*, 552 F.3d at 563 (citing favorably to

*Cardarelli*); *see also* S. Rep. 109-14, at 45, *reprinted in*
2005 U.S.C.C.A.N. 3, 43 (stating that subsection (d)(9) is
"intended to cover disputes over the meaning of the
terms of a security, which is generally spelled out in
some formative document of the business enterprise").

The Second Circuit later expanded on the *Cardarelli*
decision, explaining that the exception applies to suits
that enforce "the terms of the instruments that create
and define securities or on the duties imposed on
persons who administer securities." *Greenwich*, 603 F.3d
at 28 (quoting *Cardarelli*, 527 F.3d at 33) (alterations
omitted)). The court reasoned that "[t]he fact that a
certificate holder's rights may be enumerated in an in-
strument other than the security itself is not material.
Securities are created and defined not simply by their
own text, but also by any number of deal instruments
executed between various parties." *Id.* at 29. The court
held that the dispute doesn't need to involve a term that
defines a security and noted that while the provision at
issue didn't "define a term of plaintiffs' certificates as
clearly as would, for instance, a provision calculating
the rate of interest to be paid on the certificates, it
directly affect[ed] the amount of money available to
certificate holders in a particular circumstance." *Id.* at 30-
31. The court concluded that the exception applies to
"suits that seek to enforce the terms of instruments
that create or define securities, no matter which pro-
visions of such instruments plaintiffs' suit seeks to en-
force." *Id.* at 31.

The Agreement in this case contains terms and condi-
tions governing Morgan Stanley accounts, including

securities accounts. It provides that Morgan Stanley's "clients may open a standard securities account . . . to purchase, sell or hold securities on either a cash or margin basis." It further provides that "the securities account is a conventional margin or cash brokerage account which may be used to purchase and sell securities on margin or on a fully-paid basis."

Appert alleges that Morgan Stanley breached the Agreement by charging an HPI fee that was disproportionate to its actual costs. The Agreement at issue here doesn't *create* or *define* any particular security; its terms govern generally Morgan Stanley securities accounts for the purpose of buying and selling securities. *Compare Lincoln Nat'l Life Ins. Co. v. Bezich*, 610 F.3d 448, 449-51 (7th Cir. 2010) (finding variable life insurance policy was security because it allowed insured to allocate funds between general account and investment account and thus, exception applied to plaintiffs' claim involving cost-of-insurance charges deducted from funds). We have already found that Morgan Stanley's alleged breach of contract by charging an HPI fee that disproportionately exceeds actual costs is not material to any security transaction and following the limiting construction of subsection (d)(9)(C) in *Cardarelli* and *Greenwich*, we too find that it is not sufficient that the plaintiff's claim merely relates to a security.[3]

---

[3] We have no occasion to decide whether our conclusion would be different if we were addressing Appert's claims in

(continued...)

We now turn to the broader exception in subsection (d)(9)(A), which applies to a class action that "solely" involves a claim "concerning a covered security." The HPI fee applies when a confirmation slip is mailed to an investor who sells or buys any security at all, whether covered or not, and thus, does not *solely* concern a covered security. This raises a question as to the intended scope of "solely," but even if the class claims were limited to HPI fees charged for transactions involving covered securities, we do not find that *concerning* should be read so broadly to include Appert's claims.

"Concerning" undoubtedly has an expansive meaning and broadly construed could encompass any claim that relates to a covered security or security transaction. The purpose of the statute, however, doesn't suggest that "concerning" was intended to be read that way. *See Lebamoff Enter., Inc. v. Huskey*, 666 F.3d 455, 457 (7th Cir. 2012) (explaining that "related to" cannot be interpreted literally, especially where the statute at issue has a "focused aim"). "A word in a statute may or may not extend to the outer limits of its definitional possibilities." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). Rather,

---

[3] (...continued)

her initial complaint that Morgan Stanley violated the rules of self-regulatory organizations by imposing an unreasonable fee, *see Cardarelli*, 527 F.3d at 33 (exception applies to suits that seek to enforce "duties imposed on persons who administer securities"), because as discussed below, Appert waived such claims.

"[i]nterpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Id.* "The language and structure of CAFA . . . indicate[ ] that Congress contemplated broad federal court jurisdiction with only narrow exceptions." *Westerfeld*, 621 F.3d at 822 (quotations omitted); *see also Hart*, 457 F.3d at 681 (stating that CAFA is "intended to expand substantially federal court jurisdiction over class actions[; i]ts provisions should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant.") (citing S. Rep. No. 109-14, at 43 (2005), *reprinted in* 2005 U.S.C.C.A.N. 3, 41).

We need not delineate the outer limits of "concerning" to find that Appert's claim doesn't fall within its ambit. Appert, whose burden it is to show that the exception applies, has specifically disclaimed any intention of asserting a claim *concerning* her investments handled by Morgan Stanley. We agree with Appert that the fee didn't concern a covered security; it involves an alleged overcharge for the processing and sending of securities transaction receipts. That the stated fee included a profit to Morgan Stanley and exceeded actual costs by a few dollars doesn't affect the value of a security and was not important enough to reasonable participants in an investment decision to alter their behavior. *See Jakubowski*, 150 F.3d at 681. We acknowledge that Morgan Stanley was required to mail the confirmation slips pursuant to security exchange rules, *see* 17 C.F.R. § 240.10b-10 and NYSE Rule 409, but Appert's claim

applies generally to handling, postage and insurance charges that are found in many agreements unrelated to securities transactions.

This outcome is consistent with the stated purpose of the statute and the understanding that subsection (A) "carves out class actions for which jurisdiction exists elsewhere under federal law, such as under [SLUSA]." *Cardarelli*, 527 F.3d at 30; *see also* S. Rep. No. 109-14, at 45, *reprinted in* 2005 U.S.C.C.A.N. 3, 42 (2005) (stating that the purpose of this exception is "to avoid disturbing in any way the federal vs. state court jurisdictional lines already drawn in the securities litigation class action context by the enactment of [SLUSA]"). The Senate Report explains that "[b]ecause Congress has previously enacted legislation governing the adjudication of [claims concerning covered securities], it is the Committee's intent not to disturb the carefully crafted framework for litigating in this context." S. Rep. No. 109-14, at 50, *reprinted in* 2005 U.S.C.C.A.N. 3, 46-47. We have found that SLUSA doesn't bar Appert's suit, so a finding that CAFA applies doesn't disturb jurisdictional lines drawn by SLUSA.

We therefore conclude that our jurisdiction is secure. Now, finally, to the merits.

### III.  Dismissal of Appert's Initial and Amended Complaints

When evaluating dismissals under Rule 12(b)(6) of the Federal Rules of Civil Procedure, we "tak[e] all

well-pleaded allegations of the complaint as true and view[ ] them in the light most favorable to the plaintiff." *Santiago v. Walls,* 599 F.3d 749, 756 (7th Cir. 2010). To satisfy the notice-pleading standard of Rule 8 of the Federal Rules of Civil Procedure, a complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief," which is sufficient to provide the defendant with "fair notice" of the claim and its basis. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) and quoting Fed. R. Civ. P. 8(a)(2)). To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quotations omitted).

## A.  Initial Complaint

Appert contends she is appealing dismissal of her initial complaint and amended complaint, but she makes no argument in her opening brief that the district court erred in dismissing her initial complaint based on its finding that there was no private cause of action for violation of NASD and NASDAQ Stock Market rules. She makes a few passing references to this argument in her reply brief, but these arguments are undeveloped and come too late. This claim is therefore waived. *See*

*Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 529 (7th Cir. 2003).

## B.  Amended Complaint

Appert asserts that Morgan Stanley breached the Agreement by not disclosing the actual costs it incurred for HPI and charging an HPI fee that bore no relationship and was grossly disproportionate to actual costs. Appert also brought a related unjust enrichment claim. We affirm the district court's dismissal of the amended complaint.

Appert contends that an "objectively reasonable person" would have believed the HPI fees represented Morgan Stanley's actual costs or were at least not grossly disproportionate to those costs. Appert relies on *Jacobs v. Citibank, N.A.*, 462 N.E.2d 1182 (N.Y. 1984) to support her position. (The parties agree that New York law applies to Appert's claims.) Our reading of *Jacobs*, however, is to the contrary. In *Jacobs*, the plaintiff was assessed fees by Citibank for overdrafts on their own accounts and for depositing dishonored third-party checks. *Id.* at 1183. The court held that the plaintiffs' claim that fees for overdrafts constituted a breach of the parties' agreement because they exceeded the actual cost of processing the overdrafts was without merit. *Id.* The court reasoned that "[w]hen plaintiffs opened their accounts, each of them agreed to pay the charges specified for the services listed in the agreement, including the processing of overdrafts. [They] also agreed that those charges would be subject to

change." *Id.* The court explained: "Inasmuch as plaintiffs do not now contend that they were not notified of subsequent changes in the schedule of fees, they cannot be heard to say that defendant breached the agreements." *Id.*

When addressing fees for dishonored third-party checks, the court looked to another provision of the account agreements that vested Citibank "with discretion to determine what amount is necessary to compensate itself for services rendered." *Id.* The plaintiff alleged that Citibank violated this provision because it charged more than was necessary to cover the cost of processing checks drawn on other banks. The court responded: "The short answer to this claim is that the account agreements very plainly authorize the defendant, not plaintiffs or the courts, to decide what amount of compensation is necessary. In the absence of some showing that the charges imposed were *grossly disproportionate to processing costs usually incurred by banks in the community or otherwise imposed in bad faith*, the defendant's determination will not be disturbed." *Id.* (emphasis added).

Appert argues that *Jacobs* supports her position because the discretionary fee imposed by Morgan Stanley was *grossly disproportionate* to its actual costs, and thus, imposed in *bad faith*. Appert however makes no allegation in her amended complaint that Morgan Stanley's fee is grossly disproportionate to costs *usually incurred by brokerage firms* and the mere fact that the fee is disproportionate to actual costs by a few dollars (resulting in a profit to Morgan Stanley) does not establish

bad faith.[4] Appert could not cite a case, and we could not find one, where a court has relied on the grossly disproportionate language in *Jacobs* to support a breach of contract claim. Further, in discussing the possibility of a claim when the bank's charges are grossly disproportionate to costs usually incurred by competitors, the *Jacobs* court reviewed language in the parties' agreement that vested Citibank with discretion to determine what amount was necessary to compensate itself for services rendered. We find the discussion of the overdraft fee provision in *Jacobs* more suitable to this case: "[i]nasmuch as plaintiffs do not now contend that they were not notified of subsequent changes in the schedule of fees, they cannot be heard to say that defendant breached the agreements." 462 N.E.2d at 1183. Similarly here, Appert was given advance notice of the fee in the Agreement and there is no allegation that Morgan Stanley failed to provide subsequent notification when it

---

[4] Appert's bad faith argument rests on the same allegations that give rise to her breach of contract claim and results in the same alleged damages. "A cause of action to recover damages for breach of the implied covenant of good faith and fair dealing cannot be maintained where the alleged breach is intrinsically tied to the damages allegedly resulting from a breach of contract." *Empire One Telecomms, Inc. v. Verizon N.Y., Inc.*, 888 N.Y.S.2d 714, 730 (N.Y. Sup. 2009) (citations omitted). Appert cannot avoid the express terms of the Agreement by reliance on the implied covenant of good faith and fair dealing. *See State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 170 (2d Cir. 2004).

increased the HPI fee. The Agreement states that "[i]t is the client's responsibility to seek immediate clarification about entries that the client does not clearly understand," and also that "[a] client may terminate an account at any time . . . ." Thus, Appert could have sought clarification of the fee, and if she thought it was unreasonable, could have ended her relationship with Morgan Stanley.

New York courts since *Jacobs* have rejected causes of action resting on a defendant's alleged misrepresentation of the actual costs for shipping and handling. In an action alleging deceptive acts and practices, the New York appellate court found no cause of action where the defendant "fully disclosed shipping and handling charges" even though the charges exceeded the "defendant's actual costs." *Taylor v. BMG Direct Mktg., Inc.*, 749 N.Y.S.2d 31, 32 (App. Div. 1st Dep't 2002). "[A] disclosure that a specified amount will be charged for shipping and handling cannot cause a reasonable consumer to believe that such an amount necessarily is equal to or less than the seller's actual shipping and handling costs." *Id.* The court's focus is on whether the amount charged was disclosed, not whether it is unreasonable or excessive. *See Zuckerman v. BMG Direct Mktg., Inc.*, 737 N.Y.S.2d 14, 15 (App. Div. 1st Dep't 2002).

We find the HPI provision in the Agreement unambiguous and susceptible to only one interpretation: Morgan Stanley contracted with its customers to charge a *fixed* fee for HPI at a stated price that isn't necessarily tied to actual costs. The Agreement expressly stated:

"Other miscellaneous account fees and charges include: handling, postage and insurance (HPI) at $2.35 per transaction . . . ." It would be unreasonable to read into this language a requirement that the fee relate to actual costs; no such limitation exists. The Agreement also provided that "[a]ll fees are subject to change, and you will be notified in the event of any changes." Appert hasn't alleged that she wasn't properly notified of fee changes.

The confirmation slip also described the HPI fee as "[r]epresent[ing] charges for handling, insurance and postage, *if any*." (emphasis added). The confirmation slip was attached to Appert's initial complaint, but not her amended complaint. Even if we consider this document, when read with the Agreement, it becomes more evident that the HPI fee was a flat charge that applied per transaction irrespective of the individual costs for HPI. In fact, other fees listed on the confirmation slip expressly state that they represent "pass through" costs, whereas the HPI charge does not indicate that it is so limited.

Appert also argues that Morgan Stanley breached the Agreement by charging for insurance when none was provided. There is no allegation that Appert sought or expected insurance. The HPI fee was an all-inclusive charge for the delivery of trade confirmations, and there is no allegation that Morgan Stanley failed to send them. Whether Morgan Stanley purchased insurance is of no moment; what is relevant is that Appert was aware of the overall charge for the services rendered before doing business with Morgan Stanley. *See Strategic Risk*

*Mgmt., Inc. v. Fed. Express Corp.*, 665 N.Y.S.2d 799, 802 (Sup. Ct. 1997), *aff'd on other grounds by* 686 N.Y.S.2d 35 (App. Div. 1st Dep't 1999) (finding no breach of contract where FedEx's basic rate included an excise tax that was no longer applicable because FedEx charged an all inclusive fee for transporting packages).

The allegations in Appert's amended complaint do not state a claim for breach of contract: Morgan Stanley informed customers of the HPI fee and that is the fee it charged; customers had the option to pay the fee for the service or end their relationship with Morgan Stanley. *See, e.g., Tolbert v. First Nat'l Bank of Oregon*, 312 Or. 485, 493-94 (1991) (bank met its obligation of good faith in connection with its increases in insufficient funds check charges where the parties had agreed to, and their contract provided for, unilateral exercise of discretion by the bank regarding the charges and this discretion was exercised after prior notice).

Finally, Appert raises a claim for unjust enrichment. Appert didn't address her unjust enrichment claim until her reply brief and, as such, it's waived. *See United States v. Alhalabi*, 443 F.3d 605, 611 (7th Cir. 2006). But this claim would nonetheless fail. Unjust enrichment is a quasi-contract claim. *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (applying New York law). "It is an obligation the law creates *in the absence of any agreement*." *Id.* (emphasis in original). Thus, "[t]he existence of a valid and enforceable written contract . . . ordinarily precludes recovery in quasi contract . . . for events

arising out of the same subject matter." *MacDraw, Inc. v. CIT Group Equip. Fin., Inc.*, 157 F.3d 956, 964 (2d Cir. 1998) (applying New York law); *see also Clark-Fitzpatrick, Inc. v. Long Island R.R.*, 70 N.Y.2d 382, 389-90 (1987). Because there was a valid and enforceable contract between the parties stating the HPI fee, there can be no claim for unjust enrichment.

## IV. Conclusion

For the foregoing reasons, we AFFIRM the district court's dismissal of Appert's initial and amended complaints.