[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-13477

_____

JEFFREY A. COCHRAN,
Individually and on Behalf of All Others Similarly
Situated,

Plaintiff-Appellant,

*versus*

THE PENN MUTUAL LIFE INSURANCE COMPANY,
HORNOR, TOWNSEND & KENT, LLC,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:19-cv-00564-JPB

_____

Before WILSON, LAGOA, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

Jeffrey Cochran appeals the district court's dismissal of his putative class action claims against the brokerage firm Hornor, Townsend & Kent (HTK) and its parent company The Penn Mutual Life Insurance Company.[1] The complaint alleges that HTK breached its fiduciary duties under Georgia law and that Penn Mutual aided and abetted that breach. The district court concluded that the Securities Litigation Uniform Standards Act barred

---

[1] The court granted the defendants' motion to compel arbitration on Cochran's individual claims, but he does not challenge that part of the judgment. The court's Rule 12(b)(1) dismissal of the remaining claims had the practical effect of ending the litigation on the merits, making the judgment final. *See* 9 U.S.C. § 16(a)(3); *Green Tree Fin. Corp. Ala. v. Randolph*, 531 U.S. 79, 89 (2000) ("We therefore conclude that where, as here, the District Court has ordered the parties to proceed to arbitration, and dismissed all the claims before it, that decision is 'final' within the meaning of § 16(a)(3), and therefore appealable."); *see also Martinez v. Carnival Corp.*, 744 F.3d 1240, 1243–44 (11th Cir. 2014) ("The Supreme Court has adopted a functional test for finality, examining what the district court has done, and has reiterated that a decision is final if it ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.") (quotation marks omitted).

Cochran from using a class action to bring those state law claims. And the court was right.

## I.

The district court dismissed Cochran's class allegations under Rule 12(b)(1), accepting as true the facts alleged in Cochran's amended complaint, which is the operative one and which we will refer to simply as the complaint. *See Lord Abbett Mun. Income Fund, Inc. v. Tyson*, 671 F.3d 1203, 1205 (11th Cir. 2012). We accept the facts as alleged, just as the district court did. *See id.*

After the company where Jeffrey Cochran worked was acquired and his 401(k) plan was terminated, he transferred his 401(k) funds into a rollover individual retirement account. He opened that account with HTK, a brokerage firm and investment adviser that is a wholly owned subsidiary of Penn Mutual. The account was a "tax-qualified" or "tax deferred" one, meaning it had the tax advantage of allowing for deferral of taxes on the earnings made by investments held in the account. After Cochran opened the account, an HTK advisor "urged and directed" him "to invest his retirement funds in a Penn Mutual variable annuity." He followed that advice and did so.

A variable annuity is a "hybrid insurance and investment product." One benefit of a variable annuity is that it offers the same kind of tax deferral as an individual retirement account. But those tax benefits are "unnecessary and redundant" when the variable annuity is held within an account that is itself already tax

advantaged.    According to the complaint, a variable annuity is not a suitable investment choice for a tax advantaged account because it causes the investor to pay high fees without getting an extra tax benefit.    An account that is tax deferred in two different ways is no better than an account that is tax deferred in only one way.

Cochran's choice to invest in a variable annuity has not caused him to lose any of his investment, but he alleges that he has not gained as much as he might have if he had invested in something else.    According to the complaint, Cochran's initial investment in February 2013 of $365,274.83 had grown to $498,313.63 by September 2018.    Based on Cochran's estimation, if he had invested in something different during that time period, like a low-cost S&P 500 index, he could have avoided paying HTK fees and grown his investment to $712,435.99.

## II.

Cochran filed a putative class action lawsuit alleging that HTK breached its fiduciary duties to him and its other Georgia clients who invested in Penn Mutual's variable annuity.    He also alleged that Penn Mutual, HTK's parent company, aided and abetted the breach.    Those claims are based solely on Georgia state law.

The complaint alleges that "brokerage firms make more money selling variable annuities than they make selling other products," giving them a "true conflict of interest" that leads them to "target sales of variable annuities to persons seeking to invest [in] tax-qualified retirement funds."    The complaint asserts that the

asserted cause of action derives from Georgia state law.    It points specifically to *Holmes v. Grubman*, 691 S.E.2d 196 (Ga. 2010), as setting out the "applicable standard."    According to the complaint, *Holmes* holds that a brokerage firm owes a duty to holders of nondiscretionary accounts, like the one Cochran had, which are accounts that require the broker to get the client's authorization before making any transaction.    The complaint quotes *Holmes* as stating that the fiduciary duty is "heightened" when a broker is "recommending an investment which the holder has previously rejected or as to which the broker has a conflict of interest."

Also according to the complaint, "HTK's uniform practice of recommending that its clients use tax-qualified funds to purchase variable annuities constitutes just such a conflict of interest" because it ensured that higher fees will be paid to the firm out of the client's pocket (or account).    The complaint alleges that the brokerage account agreement assures clients that HTK will make recommendations based on product suitability and the client's investment objectives and needs.    But "[i]nstead of recommending appropriate investments for [Cochran's] IRA, HTK steered that money to variable annuities that would generate larger fees for HTK and Penn Mutual."    The complaint further alleges that "brokers are paid more for selling annuities than other products" which is "the conflict that is at the heart of this case."    It insists that the lawsuit "does not challenge the disclosures at issue here, but instead that this practice is a breach of the fiduciary duties that brokerage firms owe to their customers under Georgia law."

The complaint defines the members of the putative class as having all four of these characteristics: (1) Georgia residents, (2) who were HTK customers, and (3) who purchased a variable deferred annuity issued by Penn Mutual (4) for use in a tax qualified account.

HTK moved to dismiss Cochran's class action allegations, arguing among other things that the use of a class action is barred by federal law.[2]    The district court granted the motion, concluding that federal law did bar the class action.    It pointed to the Securities Litigation Uniform Standards Act, commonly called SLUSA, which generally prohibits class actions based on state law claims that allege material misrepresentations or omissions in connection with the purchase or sale of a security.

The district court concluded that SLUSA applies because Cochran alleges that HTK misrepresented or omitted a material fact when selling him the variable annuity.    It reached that conclusion because "the essence of the Complaint is HTK's overall fraudulent practice of recommending variable annuities in order to make more money on fees and commissions."    The court emphasized that the complaint "repeatedly references HTK's advice, assistance and recommendations," and that it alleges Cochran bought the variable annuity "*because* of what HTK represented

---

[2] HTK also moved to compel arbitration on Cochran's individual claims, which Cochran did not challenge.    As we've already noted, the district court granted the motion, which Cochran does not challenge.

20-13477                Opinion of the Court                    7

when providing its advice and recommendations." That made the essence of the complaint "the unlawful marketing of tax-deferred annuities, either by misrepresenting their suitability for tax-deferred retirement plans, or by failing to disclose their unsuitability for such accounts." It was on that basis the court dismissed Cochran's class action allegations.

## III.

We review *de novo* the court's conclusion that SLUSA's bar applies. *See Brink v. Raymond James & Assocs., Inc.*, 892 F.3d 1142, 1145 (11th Cir. 2018).

SLUSA's background and purpose are well-trod territory. The first steps start with the Private Securities Litigation Reform Act, or PSLRA. That act "institut[es] heightened pleading requirements for class actions alleging fraud in the sale or purchase of national securities" and requires a "mandatory stay of discovery until the district court [can] determine the legal sufficiency of the class action claims." *Behlen v. Merrill Lynch*, 311 F.3d 1087, 1091 (11th Cir. 2002). Congress passed the PSLRA to deal with strike suits, which are meritless lawsuits filed to justify burdensome discovery and extort nuisance settlements. *See id.* Many plaintiffs responded by seeking to circumvent the PSLRA by abandoning federal law altogether and basing their securities fraud class actions solely on state law. *Id.*; *see also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 82 (2006). Apparently displeased with the attempts to undermine its objectives, Congress reacted by enacting SLUSA. That legislation provides in relevant part:

(b) Class action limitations

No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging —

(1) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or

(2) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security

15 U.S.C. § 77p(b).

The Supreme Court has instructed us that SLUSA's text is to be broadly construed. *See Dabit*, 547 U.S. at 84–86.[3]

SLUSA's bar applies when "(1) the suit is a 'covered class action,' (2) the plaintiffs' claims are based on state law, (3) one or more 'covered securities' has been purchased or sold, and (4) the

---

[3] SLUSA's effect is sometimes called "preemption," but "SLUSA does not actually pre-empt any state cause of action" and it "does not deny any individual plaintiff, or indeed any group of fewer than 50 plaintiffs, the right to enforce any state-law cause of action that may exist." *Dabit*, 547 U.S. at 87. Instead, it "simply denies plaintiffs the right to use the class-action device to vindicate certain claims." *Id.* For that reason we will refer to SLUSA's effect as "barring" instead of "preempting." *Cf. Hampton v. Pacific Investment Mgmt. Co.*, 869 F.3d 844, 845–46 (9th Cir. 2017) (explaining reasons for doing the same).

20-13477                    Opinion of the Court                          9

defendant [allegedly] misrepresented or omitted a material fact 'in connection with the purchase or sale of such security.'"    *Behlen*, 311 F.3d at 1092.    The only disputed issue in this case is whether Cochran's complaint alleges a misrepresentation or omission.    If it does, then it is barred; if it doesn't, then it isn't barred.

To determine whether a complaint alleges a misrepresentation or omission, we look to its "gravamen" or the essence of it. *See, e.g., id.* at 1094.    Our focus is on the substance of the complaint, not on the labels the plaintiff chooses to give his claims, and not on the artful way a plaintiff words his allegations.    Because substance is what counts, SLUSA's bar might apply even if a complaint doesn't label a claim as "fraud" or "misrepresentation" and even if it studiously avoids referring to misrepresentations, omissions, deception, fraud, and so on.    As the Sixth Circuit has put it, the SLUSA determination is not "a formalistic search through the pages of the complaint for magic words" but a search to see "whether the complaint covers the prohibited theories, no matter what words are used (or disclaimed) in explaining them."    *Segal v. Fifth Third Bank, N.A.*, 581 F.3d 305, 310–11 (6th Cir. 2009).

Although we have not previously articulated all those principles explicitly, several other circuits have.    In addition to the Sixth Circuit's *Segal* decision, there are these: *Northstar Financial Advisors, Inc. v. Schwab Investments*, 904 F.3d 821, 829 (9th Cir. 2018) (noting that "[c]ourts must look to the substance of the allegations, so that plaintiffs cannot avoid [SLUSA] through artful pleading that removes the covered words but leaves in the covered

concepts") (quotation marks and ellipsis omitted); *Freeman Investments, L.P. v. Pacific Life Ins. Co.*, 704 F.3d 1110, 1115 (9th Cir. 2013) ("As our sister circuits have recognized, [SLUSA] operates wherever deceptive statements or conduct form the gravamen or essence of the claim."); *Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294, 301 (3d Cir. 2005) ("Other courts have similarly scrutinized the pleadings to arrive at the 'essence' of a state law claim, in order to prevent artful drafting from circumventing SLUSA['s bar]."); *Miller v. Nationwide Life Ins. Co.*, 391 F.3d 698, 702 (5th Cir. 2004) ("The issue of [SLUSA's bar] thus hinges on the content of the allegations — not on the label affixed to the cause of action."); *Dudek v. Prudential Securities, Inc.*, 295 F.3d 875, 879–80 (8th Cir. 2002) (agreeing that the "gravamen" of the complaint is what matters and holding that "the essence of both complaints is the unlawful marketing of tax-deferred annuities, either by misrepresenting their suitability for tax-deferred retirement plans, or by failing to disclose their unsuitability for such accounts").

The essence of Cochran's complaint is that through its investment advice and recommendations, HTK affirmatively made false statements, or failed to disclose material facts, about the suitability of the variable annuity investment for the type of account that the plaintiff had, and in that way made misrepresentations to the plaintiff.   The complaint makes at least 11 references to recommendations, advice, or other communications:

- "This is a class action seeking to challenge Defendant HTK's self-serving practice of

*recommending . . . .*"    Doc. 27 at ¶ 1 (emphasis added).

- "[T]he Justices [of the Supreme Court of Georgia] answered in the affirmative, concluding that '[t]he broker will generally have a heightened duty, even to the holder of a non-discretionary account, *when recommending an investment* which the holder has previously rejected or *as to which the broker has a conflict of interest.*'"    *Id.* at ¶ 4 (emphasis and third bracket in original).

- "HTK's uniform practice of *recommending* that its client use tax-qualified funds to purchase variable annuities constitutes just such a conflict of interest . . . ."    *Id.* at ¶ 5 (emphasis added).

- "Mr. Cochran was *urged and directed* by his HTK retirement advisor/fiduciary to invest his retirement funds in a Penn Mutual variable annuity, which he did on February 4, 2013.    *Because* Mr. Cochran *followed that advice*, his fiduciary has raked significant unnecessary fees . . . ."    *Id.* at ¶ 8 (emphasis added).

- "He was sold a Penn Mutual deferred variable annuity *based on the recommendation* of his

HTK advisor . . . ." *Id.* at ¶ 16 (emphasis added).

- "Mr. Rowell *convinced* Mr. Cochran . . . to invest those tax-qualified IRA funds in a Penn Mutual deferred variable annuity." *Id.* (emphasis added).

- "At all times relevant hereto, HTK was and is in the *business of offering investment advice* in exchange for fees.  Plaintiff and the Class members entered into a contractual relationship with HTK whereby *HTK would advise* and assist Plaintiff in *making appropriate investments*, and Plaintiff would pay a fee for such advice and assistance.   Plaintiff and the Class members carried out their end of that arrangement, but HTK did not.   *Instead of recommending appropriate investments* for Plaintiff's IRA, *HTK steered* that money to variable annuities . . . ."   *Id.* at ¶ 27 (emphasis added and citation omitted).

- "HTK knew that Plaintiff and the Class members *trusted HTK to recommend appropriate investments* and to put its customers' interests ahead of its own."   *Id.* at ¶ 56 (emphasis added).

- "Under the terms of the HTK account contract and Georgia law, HTK owed to Plaintiff and the Class members a duty *to recommend* appropriate investments for funds they entrusted to HTK." *Id.* at ¶ 60 (emphasis added).

- Listing as a question of law and fact common to the class: "whether Defendants have favored their own interests over those of Plaintiff and the Class members *by recommending* that customers' tax-qualified accounts be used to fund high-fee variable annuities[.]" *Id.* at ¶ 67 (emphasis added).

- "HTK has violated its fiduciary duties to the Class members by *providing investment advice* that was not in customers' best interests in an effort to steer Class members' money into variable annuities . . . ." *Id.* at ¶ 72 (emphasis added); *see also id.* at ¶ 79.

The substance of Cochran's complaint is that variable annuities were unsuitable investments for tax deferred accounts, but HTK recommended that clients invest in them anyway. And the complaint alleges that Cochran bought the variable annuity *because* of HTK's recommendations. If those recommendations had fully disclosed all material facts, including that a variable annuity would not have tax benefits and would be an unsuitable

investment, Cochran would have no cause of action.    If there were no false statement or omission, there is no cause of action unless HTK breached its fiduciary duty simply by selling the Penn Mutual variable annuity, regardless of disclosure, regardless of consent, and even regardless of the client's own desire and direction to the fiduciary to make the purchase.

Cochran sees it differently.    His position is that the conflict of interest HTK had cannot *ever* be consented to because no amount of disclosure can *ever* cure the breach of the duty caused by the conflict.    If he's right, the duty could be breached and the claim established without any false statement or failure to disclose a material fact.    But Cochran is not right.    Georgia law does not recognize the cause of action that his position posits.    Instead, the Georgia Supreme Court's *Holmes* decision rejects Cochran's position and in doing so scuttles his attempt to slip the grip of SLUSA. *See Holmes*, 691 S.E.2d at 201–02.

In *Holmes* the court held that under Georgia law a brokerage firm owes a fiduciary duty to the holder of a non-discretionary account.    *See id.* at 198, 201–02.    That type of account, which is what Cochran had, allows the broker to carry out only transactions that the client authorizes.    *See id.* at 201.    The *Holmes* court also held that the duty a broker owes to a client who has a nondiscretionary account includes "the duty to transact business only after receiving prior authorization from the client *and the duty not to misrepresent any fact material to the transaction.*"    *Id.* (quotation marks omitted and emphasis added).    Not only that, the court

explained, but the "broker will generally have a heightened duty" to a nondiscretionary account holder "*when recommending an investment . . . as to which the broker has a conflict of interest.*"    *Id.* at 201–02 (emphasis added).

That a broker with a conflict of interest has a heightened duty not to misrepresent by statement or omission any material fact necessarily means that a conflicted broker can nonetheless advise and recommend with full disclosure and without misrepresentation.    Which necessarily means that a conflict of interest alone is not enough for a cause of action under Georgia law.    There must be both a conflict of interest *and* a material misrepresentation or omission.

While the conflict of interest heightens the amount of disclosure and accuracy required, and thereby lessens a plaintiff's burden, it does not dispense entirely with the element of misrepresentation or omission.    Without that element, there is no cause of action.    And that is Cochran's central problem.    To be viable under Georgia law, his claims against HTK must and do involve allegations of misrepresentation or omission, and because they do, his class action allegations are SLUSA-barred.    Persuading us that he is not claiming that HTK made any misrepresentation or omission would earn Cochran only the right to have his entire complaint dismissed for failure to state a claim.

Because the complaint does allege "an untrue statement or omission of material fact in connection with the purchase or sale of

a covered security," 15 U.S.C. § 77p(b), the district court correctly dismissed the class action allegations of it.

**AFFIRMED.**